# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39555**

———————————

**UNITED STATES**
*Appellee*

**v.**

**George L. LULL**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 2 September 2020

———————————

*Military Judge:* Brian D. Teter.

*Approved sentence:* Dishonorable discharge, confinement for 4 years, and reduction to E-3. Sentence adjudged 5 January 2018 by GCM convened at Tinker Air Force Base, Oklahoma.

*For Appellant:* Major M. Dedra Campbell, USAF; Tami L. Mitchell, Esquire; David P. Sheldon, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major Jessica L. Delaney, USAF; Major Anne M. Delmare, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Senior Judge POSCH delivered the opinion of the court, in which Chief Judge J. JOHNSON and Judge KEY joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

POSCH, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of sexual assault, stalking, and assault consummated by

a battery of NB, in violation of Articles 120, 120a, and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 920a, and 128.[1,2] Appellant was sentenced to a dishonorable discharge, confinement for four years, and reduction to the grade of E-3. Before taking action, the convening authority deferred the mandatory forfeiture of Appellant's pay and allowances until action; and waived the mandatory forfeitures for the benefit of Appellant's dependent daughter for a period of six months, or upon his release from confinement or the expiration of his term of service, whichever was sooner, with the waiver commencing 14 days after the sentence was adjudged. At action, the convening authority approved the adjudged sentence.

Appellant raises 24 issues on appeal, 17 of which are assignments of error[3] Appellant raises through his appellate counsel: (1) whether the court-martial lacked personal jurisdiction over Appellant; (2) whether Appellant's confinement is unlawful because he was released from active duty the day after his court-martial concluded; (3) whether Appellant's honorable discharge effective 6 January 2018 renders Appellant's confinement unlawful or remits his unexecuted dishonorable discharge; (4) whether the evidence is legally and factually sufficient to support the convictions; (5) whether the stalking specification fails to state an offense;[4] (6) whether the military judge erred in admitting evidence under Military Rule of Evidence (Mil. R. Evid.) 404(b); (7) whether the military judge erred in allowing expert testimony on abusive relationships; (8) whether the military judge erred in not ruling on the admissibility of a Defense exhibit; (9) whether the court-martial lacked subject-matter jurisdiction over the sexual assault charge because Appellant was not placed on notice of the theory to defend against, and his conviction was based on theories neither charged nor referred to trial; (10) whether the military judge erred in instructing the members on alternate theories of criminal liability for sexual assault that were neither charged nor referred to trial; (11) whether the military judge erred in permitting NB to give an unsworn statement that referenced impact arising from uncharged misconduct, her participation in Appellant's trial, past and future

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Appellant was found guilty of the assault consummated by a battery offense by exception and substitution. Appellant pleaded not guilty and was acquitted of a second specification each of sexual assault and assault consummated by a battery, in violation of Articles 120 and 128, UCMJ, 10 U.S.C. §§ 920, 928.

[3] We reordered the assignments of error Appellant presents in his brief.

[4] We consider assignment of error (5) in our resolution of assignment of error (4).

victims, and impact on coworkers under the theory that such statements are improper victim impact under Rule for Courts-Martial (R.C.M.) 1001A; (12) whether the military judge erred by failing *sua sponte* to provide an instruction on NB's unsworn victim statement and the impact of a punitive discharge on retirement benefits; (13) whether a sentence of a mandatory dishonorable discharge is unconstitutional; (14) whether the sentence is inappropriately severe; (15) whether Appellant is entitled to relief for excessive post-trial delay where the convening authority did not take action until 286 days after Appellant's court-martial; (16) whether Appellant was denied effective assistance of counsel under the Sixth Amendment;[5] and (17) whether the cumulative effect of errors substantially impaired the fairness of Appellant's court-martial. With respect to issues (8), (13), and the claim that Appellant's counsel were ineffective by failing to make various objections to testimony on the basis of hearsay, relevance, and Mil. R. Evid. 404(b), as presented in issue (16), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Appellant personally raises seven issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (18) whether the military judge erred in denying the Defense's motion to dismiss due to a defective referral as a result of the Government's failure to provide discovery in a timely manner; (19) whether the military judge erred in refusing to permit the Defense to introduce evidence under Mil. R. Evid. 412; (20) whether trial counsel committed prosecutorial misconduct during rebuttal and sentencing arguments; (21) whether Appellant is entitled to relief for egregious post-trial conditions of confinement; (22) whether Appellant is entitled to new post-trial processing because the Government failed to serve Appellant with a complete copy of the record of trial (ROT), the addendum to the staff judge advocate's recommendation failed to adequately address the defense-raised legal error of ineffective assistance of counsel, and because confinement officials removed pages and exhibits from Appellant's copy of the ROT; (23) whether the convening authority abused his discretion by failing to explain why he denied Appellant's request to defer the

---

[5] U.S. CONST. amend. VI. We consider Appellant's claim that his counsel were deficient in failing to object to NB's unsworn statement presented in the sentencing hearing in our resolution of assignment of error (11). Appellant also claims his counsel were deficient in failing to introduce evidence of the value of retirement benefits he was ineligible to receive due to the mandatory dishonorable discharge. We consider this issue after our resolution of assignment of error (11).

adjudged reduction in grade; and (24) whether the report of result of trial incorrectly states that Appellant's conviction qualifies as "domestic violence." We have carefully considered issues (18) through (24) and determine they are without merit and warrant no discussion or relief; and, based on our resolution of all issues, we find no merit to assignment of error (17).[6] *Matias*, 25 M.J. at 361.

In addition to issues (1) through (24), we consider two issues identified during this court's Article 66(c), UCMJ, 10 U.S.C. § 866(c), review. In deciding if the military judge erred in the findings instructions he gave to the members in our resolution of assignment of error (10), we also determine if Appellant is entitled to relief for the military judge's error in failing to instruct the members on the charged timeframe for the stalking offense. We also determine if Appellant is entitled to relief for untimely appellate review.

We find Appellant's convictions both legally and factually sufficient, and no error materially prejudicial to the substantial rights of Appellant occurred. Thus, we affirm the findings and sentence.

## I. BACKGROUND

Appellant is a member of the Air Force Reserve and was often recalled to active duty for training and in support of military operations. In early December 2014, Appellant had been recalled to active duty when he met NB at his neighbor's home across the street from his house before they all went to a squadron Christmas party. Appellant and his neighbor were assigned to the same reserve unit at Tinker Air Force Base (AFB), Oklahoma, and the neighbor and NB were friends. Appellant and NB began dating after the Christmas party.[7] Three weeks later on Christmas Day, Appellant and NB were guests at a dinner party in his neighbor's home. NB had been drinking in the afternoon as she helped prepare the food, and she became increasingly intoxicated throughout the evening.

Because of the amount of alcohol she consumed, Appellant helped NB walk to his home after the dinner party. The next thing NB remembered was being on her hands and knees and Appellant was having sexual intercourse with her from behind. Although they had been sexually intimate with each other earlier

---

[6] We will set aside the findings or sentence, as appropriate, if the cumulative effect of all plain and preserved errors denied an appellant a fair trial. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011). "Assertions of error without merit are not sufficient to invoke this doctrine." *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999).

[7] NB had no military affiliation of her own when she and Appellant started dating. Shortly after, in February 2015, NB enlisted in the United States Army Reserve and left for basic training the following month, in mid-March.

in the relationship, NB testified it was the first time Appellant engaged her in sexual intercourse. Appellant's conduct that evening was the basis for his conviction for sexual assault that was charged in Specification 1 of Charge I. NB testified she was ashamed to tell her friends what happened and felt some responsibility for the sexual assault because she was drunk. Even so, NB maintained a relationship with Appellant after the sexual assault because she felt affection for him in the few weeks they were together and believed she could trust him as they "started building a relationship."

Appellant remained on active duty between January and mid-March 2015. During this time, Appellant frequently observed NB from outside her apartment and while parked in his truck near the federal facility where she worked as a corrections officer, watching to see whom she was with when she was not alone. One evening when NB's sister and her sister's three children spent the night in NB's home, NB heard the distinctive sound of Appellant's truck engine in the parking lot. Before long, Appellant banged on the door to her apartment and demanded to know whom she was with, his anger fueled by an assumption that NB was with another man and having sex with him in her home. Appellant's conduct in proximity to NB's home and place of work was the basis for his conviction for stalking that was charged in the Specification of the Additional Charge. Although NB did not then report Appellant's conduct to law enforcement, she began relating to others how Appellant treated her in the relationship, including concerns she expressed to her sister, a coworker, the apartment manager, and Appellant's neighbor, who all testified at trial after Appellant challenged NB's credibility and the truthfulness of her testimony.

Sometime in January 2015 and within the charged timeframe for the stalking offense, Appellant and NB were relaxing on a couch in her apartment. As NB lay down with her head on his lap, Appellant compressed his arm around her neck in a chokehold without apparent provocation. NB felt the pressure of Appellant strangling her and grabbed for Appellant's hand before she passed out. NB's coworker asked her about bruises he observed around NB's neck after the incident, and NB told him "she got choked out" by her boyfriend. The coworker encouraged NB to report Appellant's conduct to the police, but NB told him she was afraid to make a statement because Appellant said he had friends in the police department. Appellant's conduct was the basis for his conviction for assault consummated by a battery that was charged in Specification 1 of Charge II.

For the most part, Appellant and NB were in a long-distance relationship after the end of the charged timeframe for the stalking offense until near the end of 2015. In mid-March of 2015, NB left for Army basic training followed by technical training, and then training for a new civilian job in law enforcement on the east coast. She had limited contact with Appellant while she was away

from home or when Appellant was deployed. Appellant's conduct came to the attention of authorities after Appellant strangled NB a second time at the end of the year, when Appellant was not subject to military jurisdiction. Appellant had flown to visit NB during the Christmas holiday in December 2015 when NB had a break in her law enforcement training at a school she was attending in Georgia. NB described at trial how Appellant strangled her with his right arm as he stood behind her in the shower of her dorm room, and she collapsed to the floor. Before New Year's Eve, NB told a classmate what happened and he reported the recent incident to an instructor. NB subsequently reported Appellant's conduct to a federal law enforcement agent who relayed the information to Appellant's unit, and a command-directed investigation ensued. A subsequent investigation by the Air Force Office of Special Investigations uncovered that Appellant engaged in other acts of misconduct, including strangulation and sexual assault of a previous intimate partner, PH, whom he dated between the summer of 2013 and spring of 2014.

At trial, the Government presented NB's testimony and testimony of witnesses who recounted statements NB made to them about the acts underlying the charged offenses. The Government also presented testimony concerning Appellant's behavior during his relationship with NB that the military judge admitted as crimes, wrongs, or other acts under Mil. R. Evid. 404(b). Among the acts of uncharged misconduct the military judge admitted was testimony that Appellant strangled NB in the shower in December 2015; and that in his prior relationship with PH, Appellant would strangle her when they were sexually intimate, and that he often would enter PH's residence without her knowledge or permission. The Government also introduced propensity evidence of Appellant's sexual misconduct with PH that was admitted under Mil. R. Evid. 413 to prove Appellant's sexual assault of NB. The Government's final witness was a forensic psychologist who explained how individuals maintain control in abusive relationships and the barriers that keep victims from ending those relationships and leaving an abuser. At trial, Appellant defended against the three charges principally on the basis that NB was not a credible witness and her testimony and prior statements were untruthful.

In this appeal, Appellant maintains that NB's testimony and pretrial statements were unreliable and claims numerous errors in both the findings and sentencing phases of his court-martial, as well as errors in post-trial processing. We consider the claimed errors and begin with Appellant's contention that the court-martial was without jurisdiction to try him for offenses under the UCMJ because he was a reservist.

## II. DISCUSSION

### A. Personal Jurisdiction

In his first assignment of error, Appellant claims the Government failed to allege and prove at trial that he was on active duty during the timeframes charged by the Government. It follows, Appellant contends, that the findings and sentence must be set aside because the Government failed to prove the court-martial had personal jurisdiction at the time of the offenses. *See*, *e.g.*, *United States v. Ali*, 71 M.J. 256, 265 (C.A.A.F. 2012) ("[J]urisdiction over the person depends on the person's status as a person subject to the Code both at the time of the offense and at the time of trial." (citations and internal quotation marks omitted)). Appellant also claims the findings and sentence must be set aside because he was not properly recalled to active duty for the purpose of trial by court-martial, and thus there was no personal jurisdiction to try him. *See id.* We disagree and find the Government had personal jurisdiction over Appellant both at the time of each offense and at trial.

#### 1. Personal Jurisdiction at the Time of the Offenses

"A reservist is subject to jurisdiction under Article 2(a), UCMJ, from the date of activation, and answerable under the UCMJ for any offense committed thereafter." *United States v. Morita*, 74 M.J. 116, 120 (C.A.A.F. 2015) (citing *United States v. Cline*, 29 M.J. 83, 85–86 (C.M.A. 1989)) (internal quotation marks and alteration omitted). "Jurisdiction continues until 'active service has been terminated.'" *United States v. Hale*, 78 M.J. 268, 271 (C.A.A.F. 2019) (citing Article 2(c), UCMJ, 10 U.S.C. § 802(c)).

Appellant claims the charges must be dismissed because the Government did not prove at trial that at the time of the offenses he was a member of the Air Force on active duty and thus subject to the personal jurisdiction of a court-martial. Ordinarily, an accused who wants to challenge jurisdiction would move at trial to dismiss the charges under R.C.M. 907(b)(1). In that event, the burden of persuasion is on the Government to show proper jurisdiction, R.C.M. 905(c)(2)(B), and appellate review is de novo, *see*, *e.g.*, *Hale*, 78 M.J. at 270 (citing *EV v. United States*, 75 M.J. 331, 333 (C.A.A.F. 2016)).[8] "When challenged, the Government must prove jurisdiction by a preponderance of evidence." *Id.* (citations omitted). Appellant challenges personal jurisdiction for

---

[8] When an appellant contests personal jurisdiction at trial we "accept[ ] the military judge's findings of historical facts unless they are clearly erroneous or unsupported in the record." *United States v. Hart*, 66 M.J. 273, 276 (C.A.A.F. 2008) (quoting *United States v. Melanson*, 53 M.J. 1, 2 (C.A.A.F. 2000)).

the first time on appeal,[9] *see* R.C.M. 907(b)(1), thus we employ the fact-finding authority given to this court under Article 66, UCMJ, in reviewing information necessary to decide the question. *See, e.g.*, *United States v. Cendejas*, 62 M.J. 334, 338 (C.A.A.F. 2006).

The dates when Appellant was on active duty and under military jurisdiction are well documented in matters attached to the record of trial. The documentation shows that Appellant was subject to military jurisdiction when he committed each offense. Article 2(a)(1), UCMJ, 10 U.S.C. § 802(a)(1). To reach this conclusion, we need look no further than a certified Air Force (AF) Form 938 that confirms Appellant's continuous active duty status during the relevant period.[10] Appellant was activated from 1 December 2014 through 1 May 2015, a period that encompasses each timeframe charged by the Government.[11] His voluntary activation began 25 days before the charged assaults and a month before the first date of the stalking offense, and Appellant remained on active duty for six weeks after the end of the charging window for the stalking offense. According to the AF Form 938, during his recall Appellant was assigned to the 970th Airborne Air Control Squadron (AACS) at Tinker AFB while providing support to the 966th AACS, which we judicially note[12] is an active component unit of the Regular Air Force.

---

[9] Before trial, Appellant initially moved to dismiss the charges for lack of personal jurisdiction claiming that no general court-martial convening authority (GCMCA) had ordered Appellant to active duty for preferral of charges or the Article 32, UCMJ, preliminary hearing. In response, the Government presented a memorandum from the GCMCA that directed Appellant's recall for these purposes, and Appellant's trial defense counsel then stated that Appellant's motion was moot.

[10] Air Force Form 938, *Request and Authorization for Active Duty Training/Active Duty Tour,* is the order (identified as Reserve Order No. D6CSEE in block 32), dated 14 November 2014, authorizing Appellant to active duty. This order is included in the Air Force Office of Special Investigations (AFOSI) report of investigation (ROI) which was attached to the 8 May 2017 letter appointing the preliminary hearing officer, located in the record of trial.

[11] The Government alleged the sexual assault occurred on or about 26 December 2014, the assault consummated by a battery occurred between on or about 26 December 2014 and on or about 14 February 2015, and the stalking occurred between on or about 1 January 2015 and 15 March 2015. The members announced findings without making exceptions to, or substitutions for, these dates.

[12] A Court of Criminal Appeals may "take judicial notice of an undisputed fact or question of domestic law that is important to the resolution of an appellate issue, [but] it cannot take judicial notice of facts necessary to establish an element of the offense." *United States v. Paul*, 73 M.J. 274, 280 (C.A.A.F. 2014).

The day after the conclusion of his tour, on 2 May 2015, Appellant placed his signed acknowledgement on the AF Form 938 stating that he complied with the order, and a certifying official attested on 2 May 2015 that Appellant "reported for duty at 0730 hours on 20141201 [1 December 2014] and was released from duty at 1600 hours on 20150501 [1 May 2015]." The testimony and evidence at trial convincingly established Appellant engaged in the charged conduct within each of the timeframes when he was on active duty and assigned to the 970th AACS, and Appellant's reserve unit of assignment was identified in each specification.[13]

Even so, Appellant claims the Government was required to allege and prove *at trial* that he was on active duty at the time of the offenses even though Appellant raised no objection at trial and challenges personal jurisdiction for the first time on appeal. This is so, he contends, because he is a reservist and the 970th AACS is a unit of the Air Force Reserve. Appellant relies on the discussion to R.C.M. 307(c)(3), which states, "[t]he specification should describe the accused's . . . status which will indicate the basis for jurisdiction" when an accused is not on active duty. Discussion (C)(iv)(b). However, reliance on this language is inapt because Appellant had been recalled to active duty service. The lead sentence of the Discussion states that setting forth the basis for personal jurisdiction in the charging instrument is only suggested for persons subject to the UCMJ by reason of Article 2(a), UCMJ, subsections (3) through (12)—code provisions that are different from the basis for personal jurisdiction here, Article 2(a)(1), UCMJ. Ordinarily, and "[a]s a general rule, a specification is not required to state the authority for personal jurisdiction over the accused when the accused is on active duty." *United States v. Miller*, 78 M.J. 835, 844 (A. Ct. Crim. App. 2019) (citing R.C.M. 307(c)(3), Discussion (C)(iv)(a)–(b)), *rev. denied*, 79 M.J. 242 (C.A.A.F. 2019). We find Appellant's status as a member of a reserve component and his assignment to the 970th AACS, a reserve unit, and the identification of that unit in the three specifications of which he was convicted, did not require the Government to allege and prove at trial that it had personal jurisdiction that went unchallenged until appeal.

Appellant similarly contends that Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, ¶ 2.14.2 (8 Dec. 2017),[14] which stipulates that

---

[13] The AF Form 938 and other evidence in the record supports an additional basis to find jurisdiction: Appellant received pay and allowances for performing military duties after consenting to being ordered to active duty and meeting minimum age and mental competence qualifications. *See* Article 2(c), UCMJ, 10 U.S.C. § 802(c).

[14] The policy is currently described in AFI 51-201, *Administration of Military Justice*, ¶ 4.14.2 (18 Jan. 2019, as amended by AFGM 2020-01, 8 Apr. 2020).

"trial counsel must introduce sufficient evidence to establish in-personam jurisdiction over the accused at the time of the offense," requires proof *at trial* that Appellant was on active duty at the time of the offenses. (Citations omitted). However, Appellant made no similar claim at trial, and the argument that the language of AFI 51-201 creates a legal requirement to prove jurisdiction at trial, even when there is no challenge, is no more persuasive now than it was when this court rejected it in *United States v. Gardner*, No. ACM S30091, 2003 CCA LEXIS 198 (A.F. Ct. Crim. App. 27 Mar. 2003) (per curiam) (unpub. op.), *rev. denied*, 59 M.J. 116 (C.A.A.F. 2003). In *Gardner*, this court held,

> From its context, the language of the instruction is advisory—there is no indication it was intended to create a new element for offenses committed by reservists beyond those defined by Congress in the UCMJ, or detailed by the President in the *Manual for Courts-Martial*. There is nothing to indicate that the instruction was intended to create some additional substantive right for an accused, such that a failure to follow the instruction's guidance would generate grounds for appellate relief.

*Id.* at *4–5.

We find Appellant's signed, certified AF Form 938 shows he was serving on active duty while assigned to the 970th AACS at Tinker AFB during each timeframe charged by the Government for the three offenses that Appellant was found guilty of committing, and thus the Government had personal jurisdiction over Appellant at the time of each offense. We further find that the Government was not required at trial to prove personal jurisdiction that went unchallenged until appeal.

### 2. Recall to Active Duty and Personal Jurisdiction at Trial

Appellant contends that he was not properly recalled to active duty for trial by court-martial. On 7 April 2017, the then-acting Secretary of the Air Force (SECAF), by memorandum, approved a request to recall Appellant to active duty. This request was submitted by the commander of the Air Force Sustainment Center (AFSC), who was also the general court-martial convening authority (GCMCA) who referred the charges against Appellant to trial by general court-martial. The SECAF memorandum was addressed to the AFSC commander and approved Appellant's recall to active duty, stating,

> On 20 December 2016, you requested my approval, pursuant to Article 2(d)(5), Uniform Code of Military Justice, [10 U.S.C. § 802(d)(5)], to recall [Appellant] to active duty, as needed, for military justice action. You made this request so that, if he is convicted, a court-martial may adjudge, and [Appellant] may be

required to serve, a sentence to confinement or restriction on liberty. I hereby approve any recall to active duty of [Appellant] that you have ordered or may hereafter order.

On 18 April 2017, the AFSC commander, by memorandum, ordered Appellant to active duty pending disposition of charges that subsequently would be preferred:

Pursuant to AFI 51-201, paragraph 2.9, I direct that [Appellant] be *involuntarily* ordered to active duty for preferral of charges, a pre-trial hearing, and, if warranted by the evidence presented at the preliminary hearing, trial by court-martial.

(Emphasis added).

On 28 April 2017, an AF Form 938 was generated recalling Appellant to active duty effective on the date charges were preferred, 1 May 2017.[15] Appellant continuously remained on active duty until 6 January 2018, the day after he was sentenced and the court-martial adjourned.[16] The AF Form 938 specified, "By order of the Secretary of the Air Force[,] member is on *involuntary* call[-]up pending court martial action." (Emphasis added). However, block 18(a) of the form cited the authority for the tour as 10 U.S.C. § 12301(d) as did six amendments. Furthermore, neither the SECAF nor the AFSC commander cited 10 U.S.C. § 802, which provides that a member of a reserve component may be ordered to active duty involuntarily for the purpose of an Article 32, UCMJ, 10 U.S.C. § 832, investigation and trial by court-martial.

Appellant argues that because AF Form 938 erroneously cited 10 U.S.C. § 12301(d) as authority to order him to active duty, we must look no further than that section to determine if his recall was valid. Section 12301(d) provides that "[a]t any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, *with the consent of that member*." (Emphasis added). Appellant argues that because the order cited § 12301(d), it follows

---

[15] An Article 32, UCMJ, 10 U.S.C. § 832, preliminary hearing was held on 12 June 2017. An additional charge was preferred on 31 July 2017 and a second preliminary hearing was held on 11 August 2017.

[16] Seven amendments to the AF Form 938 in succession changed Appellant's release from active duty to 31 July 2017, 30 September 2017, 31 December 2017, 5 January 2018, 9 January 2018, 12 January 2018, and a final amendment curtailing the order to 6 January 2018. Appellant attached a copy of the AF Form 938, as amended—with an uncertified statement of Appellant's duty—to his 7 September 2018 clemency request.

that a valid recall, and, therefore, personal jurisdiction, would require his consent, which he had not given.

We find the apparent administrative error in citing 10 U.S.C. § 12301(d) on the AF Form 938 did not divest the court-martial of personal jurisdiction. The AFSC commander who referred the charges directed Appellant's involuntary recall after requesting approval to recall Appellant to active duty, as needed, from the SECAF. The SECAF then approved "any recall to active duty of [Appellant] that you have ordered or may hereafter order." The commander's recall was then administratively executed, and Appellant was issued an AF Form 938, as amended, that effectuated the commander's intent and directed Appellant's "*involuntary* call[-]up pending court martial action." (Emphasis added). The statutory requirements necessary to order Appellant to active duty status involuntarily under Article 2, UCMJ, were met despite the apparent error in citing authority that required Appellant's consent to be recalled, which no evidence suggests was given. *See United States v. Ferrando*, 77 M.J. 506, 512 (A.F. Ct. Crim. App. 2017) (citing *United States v. O'Connor*, No. ACM 38420, 2015 CCA LEXIS 47, at *11 (A.F. Ct. Crim. App. 12 Feb. 2015) (unpub. op.) (holding that erroneous citation to 10 U.S.C. § 12301(d) in reservist appellant's orders was an administrative error that did not divest the court-martial of personal jurisdiction when the Air Force clearly intended to recall Appellant to active duty for his court-martial pursuant to the GCMCA's directive and the Secretary's approval)).

We are unwilling to hold that an apparent mistake on Appellant's AF Form 938 in carrying out the otherwise clear intent of senior Air Force officials to properly recall Appellant to active duty warrants a conclusion that jurisdiction is lacking. We find no reason to depart from our holding in *Ferrando*, that "an administrative or clerical error committed by the Air Force in properly exercising its statutory jurisdiction over a member does not divest the court-martial of its otherwise lawful jurisdiction over that member." 77 M.J. at 512. We conclude Appellant was properly recalled to active duty for trial by court-martial without his consent, and the Government had personal jurisdiction over Appellant at the time of his court-martial.

**B. Release from Active Duty after Adjournment and Honorable Characterization of Service**

Appellant was involuntarily recalled to active duty effective 1 May 2017. A subsequent amendment curtailed the recall order to the day after his court-martial, 6 January 2018. Appellant claims his continued confinement is unlawful because he was released from active duty the day after his court-martial adjourned. Appellant also claims he was honorably discharged after trial, thus rendering his confinement unlawful and remitting his dishonorable discharge. We are not persuaded by either contention.

### 1. Additional Background

Late in the evening on 5 January 2018, officer members announced their findings and sentence, and Appellant began serving his four-year sentence to confinement. About a week after trial concluded, the Government curtailed Appellant's 12 January 2018 release from active duty to 6 January 2018. On 10 February 2018, the convening authority approved Appellant's request to defer the mandatory forfeitures of Appellant's pay and allowances until action, and waived the mandatory forfeitures for a period of six months for the benefit of Appellant's dependent child, with the waiver commencing 14 days after the sentence was adjudged.[17]

Because Appellant's active duty status was terminated effective 6 January 2018, there was initially no pay or allowances to carry out the convening authority's direction to defer and waive forfeitures for the benefit of Appellant's daughter. Then, on 24 May 2018, a personnel officer, Major (Maj) AH, signed two special orders "involuntarily recall[ing]" Appellant to active duty, citing 10 U.S.C. § 802(d) as authority for the recall.[18] One order was retroactive, covering the period 5 January 2018 to 19 July 2018, and was "for the purpose of serving the confinement adjudged at [Appellant's] court-martial and executing the GCMCA[-]approved deferment and waiver of automatic (mandatory) forfeitures." The second order covered a much longer period, 20 July 2018 to 19 January 2022, and was "for the purpose of serving [Appellant's] adjudged sentence of confinement from [Appellant's] general court-martial conviction."

Several months after trial concluded, Appellant was issued a DD Form 214, *Certificate of Release or Discharge from Active Duty*, reflecting an "Honorable" characterization of service for the period beginning on 1 May 2017 through Appellant's release from active duty on 6 January 2018.[19] The date range encompassed the period that Appellant underwent UCMJ disciplinary proceedings and ended on the first full day of Appellant's sentence to confinement.

### 2. Law

Article 2(d)(1), UCMJ, 10 U.S.C. § 802(d)(1), explains that a member of a reserve component who is not on active duty and who is made the subject of UCMJ proceedings may be ordered to active duty involuntarily for the purpose of a preliminary hearing or trial by court-martial. If the order to active duty is

---

[17] *See* Articles 57(a)(2) and 58b(b), UCMJ, 10 U.S.C. §§ 857(a)(2), 858b(b).

[18] This court granted Appellee's motion to attach the orders along with a declaration of an accounting specialist and a military pay voucher showing payment of $16,959.00 to Appellant's daughter on 13 July 2018. Both orders directed that travel, per diem, lodging, and meal reimbursement were not authorized.

[19] This court granted Appellant's motion to attach the DD Form 214.

"approved by the Secretary concerned," such member may "be sentenced to confinement" Article 2(d)(5), UCMJ. Members of a reserve component who are sentenced to confinement are "[p]ersons in custody of the armed forces serving a sentence imposed by a court-martial" and subject to the UCMJ. *See* Article 2(a)(7), UCMJ, 10 U.S.C. § 802(a)(7).

Rule for Courts-Martial 204(b)(1) implements requirements for the retention on active duty of reserve component personnel who have been sentenced to confinement:

> A member ordered to active duty pursuant to Article 2(d) may be retained on active duty to serve any adjudged confinement or other restriction on liberty if the order to active duty was approved in accordance with Article 2(d)(5), but such member may not be retained on active duty pursuant to Article 2(d) after service of the confinement or other restriction on liberty.

The Secretary concerned is authorized by R.C.M. 204(a) to prescribe rules and procedures for ordering a reservist to active duty for disciplinary proceedings under the UCMJ.[20] As noted previously, AFI 51-201 is one such instruction that implements the UCMJ and Manual for Courts-Martial for the Department of the Air Force. AFI 51-201, ¶ 1.1. Specifically for members of a reserve component, the AFI provides that upon final adjournment of a court-martial,

> the reserve component member ordered to active duty for the purpose of conducting disciplinary proceedings should be released from active duty within one working day, unless the order to active duty was approved by the Secretary of the Air Force and confinement was adjudged. The court-martial convening authority who convenes the court shall fund the active duty orders of the reserve component member being court-martialed, including the duration of confinement.

*Id.* at ¶ 2.14.7.[21]

---

[20] See R.C.M. 204(a), Discussion ("Such regulations should describe procedures for ordering a reservist to active duty for disciplinary action, preferral of charges, preliminary hearings, forwarding of charges, referral of charges, designation of convening authorities . . . , and for other appropriate purposes.").

[21] The policy is currently described in AFI 51-201, *Administration of Military Justice*, ¶ 4.14.7 (18 Jan. 2019, as amended by AFGM 2020-01, 8 Apr. 2020).

### 3. Analysis

Appellant contends that the retroactive termination of his active duty status and the Government's failure to continue his active status after 6 January 2018 render his confinement unlawful. Appellant similarly contends that his honorable "discharge" causes his confinement to be unlawful and remits his approved dishonorable discharge. We address each contention in turn.

### a. Curtailment of Appellant's Active Duty Status after Adjournment

While acknowledging the orders Maj AH issued after Appellant's court-martial purport to return Appellant to active duty for the duration of confinement, Appellant claims the orders are void *ab initio* because they were not issued by the convening authority, and thus Maj AH lacked authority to order Appellant to active duty to serve confinement.[22] As a result, Appellant complains that he did not receive pay and allowances or earn leave for the two-week period following his court-martial, his dependent daughter was denied TRICARE military medical benefits, and he was placed in an absent without leave (AWOL) status in his civilian employment and lost his job as a consequence. Appellant also contends "[h]ad he been continued on active duty during confinement," he would have been placed in a leave-without-pay status, which would have afforded Appellant rights under the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. §§ 4301–4335, and allowed Appellant to return to his civilian employment after serving his sentence.

Appellant's contention that his confinement is unlawful because he was not properly ordered to active duty for the duration of confinement appears to present a novel legal question for this court to decide. However, Appellant's argument is based on policy; it lacks support in the text of the UCMJ. The primary basis for the Government asserting jurisdiction over Appellant at trial was Article 2(d)(1), UCMJ, which concerns the legal authority to order a reservist to active duty involuntarily for the purpose of a preliminary hearing or "trial by court-martial." Appellant's court-martial concluded and confinement began at

---

[22] We also considered Appellant's claims in his 10 October 2018 request for extraordinary relief in the nature of a writ of habeas corpus and a writ of mandamus, asking this court to order the commanding officer of the Naval Consolidated Brig Charleston to immediately release Petitioner-Appellant from confinement. In that petition, Appellant argued that (1) the orders were signed by Maj AH who has no authority to recall him to active duty; (2) there is no indication Maj AH acted on behalf of the GCMCA; (3) the wrong confinement location is listed; and (4) the letterhead is not the same as that of the GCMCA. *Lull v. Brobst*, Misc. Dkt. No. 2018-04, 2018 CCA LEXIS 559, at *8–9 (A.F. Ct. Crim. App. 6 Dec. 2018) (opinion). We find no merit to these claims.

the end of the sentencing hearing. *See* Article 57(b), UCMJ, 10 U.S.C. § 857; R.C.M. 1011, *Adjournment*; *see also United States v. Turner*, 79 M.J. 401, 405 n.6 (C.A.A.F. 2020) ("The term 'court-martial' has a specialized, well-defined meaning in the military. A court-martial is not over until it is, in fact, adjourned, and adjournment occurs after the sentencing phase of the proceeding."). We are aware of no requirement in the *code* to continue an appellant on orders that recalled him to active duty status after the military judge adjourns the court-martial.

Specifically, neither Article 2, UCMJ, nor any other provision of the code demands that a government official initiate, much less continue, active duty orders to hold a servicemember for the duration of adjudged confinement. We find support for this conclusion from the text of Article 2(d)(5), UCMJ. If the order to active duty has been "approved by the Secretary concerned," then such member may "be sentenced to confinement" without more. *Id.* Members of a reserve component who are sentenced to confinement become "[p]ersons in custody of the armed forces serving a sentence imposed by a court-martial" and are subject to the UCMJ. Article 2(a)(7), UCMJ. It follows then that Appellant's recall to active duty status through adjournment is determinative of whether it was lawful to confine Appellant after his court-martial ended. Action by the SECAF approving the convening authority's recall of Appellant to active duty for trial by court-martial was enough for Appellant to be lawfully ordered to serve confinement. All that the code requires is that a reservist be ordered to active duty for a "preliminary hearing," "trial by court-martial," or "nonjudicial punishment." *See* Article 2(d)(1)(A)–(C), UCMJ. There is no similar provision in the code that would require the Government to again recall an appellant or take action to continue active status after a trial by court-martial has concluded as a condition for confinement to be lawful.

We find the convening authority's order directing Appellant to be recalled to active duty for court-martial with the approval by the SECAF was sufficient authority for the Government to lawfully confine Appellant after the court-martial. This is not just a conclusion we draw from Article 2, UCMJ, but the intention of the President that is most clearly stated in R.C.M. 202(c)(1): "Once court-martial jurisdiction over a person attaches, such jurisdiction shall continue for all purposes of trial, sentence, *and punishment*, notwithstanding the expiration of that person's term of service or other period in which that person was subject to the code or trial by court-martial." (Emphasis added). Here, jurisdiction attached when the convening authority recalled Appellant to active duty with the approval of the SECAF, and it continues through confinement after Appellant's order to active duty was curtailed.

Although there is no apparent requirement under the code to maintain a reservist on orders through the duration of confinement, the Government exercised authority under R.C.M. 204(b)(1), which provides that a reservist "*may* be retained on active duty to serve any adjudged confinement." R.C.M. 204(b)(1) (emphasis added). After the convening authority's direction to defer and waive forfeitures for the benefit of Appellant's daughter, and consistent with the terms of R.C.M. 204(b)(1), Maj AH signed two special orders with identical fund cites that involuntarily recalled Appellant to active duty. The parties agree that the purpose and effect of the first order was to obligate funds to comply with Appellant's deferment and waiver request that had been granted by the convening authority. Appellant contends the second order, unlike an AF Form 938 issued at the direction of the convening authority, effectively placed Appellant in an active duty status without military benefits for his dependent daughter.

Nonetheless, we find no basis in law or regulation for Appellant's contention that the special orders Maj AH issued are void *ab initio* on grounds that only a convening authority was authorized to order Appellant to active duty for the duration of confinement. We also find no evidence that Appellant was prejudiced even if he is correct. R.C.M. 204(b)(1) does not *require* the Government to extend active duty orders to encompass periods of post-trial confinement. This is so even "if the order to active duty was approved in accordance with Article 2(d)(5)," as it was in Appellant's case. *Id.* Rather, the Government *may* do so in situations where the Government considers continuation of recall to be necessary, as it was here to the extent that the convening authority directed deferment and waiver of forfeitures. Although Appellant claims prejudice because the deferment and waiver of forfeitures were delayed, there is no claim that the Government failed to eventually comply with the convening authority's direction and transfer funds to Appellant's daughter.[23] We decline to exercise our Article 66(c), UCMJ, authority to grant relief on the basis of the Government's delay in carrying out the convening authority's intent.

Finally, Appellant has not shown prejudice to a right that this court has jurisdiction to remedy or protect. Appellant claims prejudice because he did not

---

[23] Appellant again cites AFI 51-201, ¶ 2.14.7, for authority that the Government was prohibited from curtailing his active duty status at the same time it required the convening authority to fund his recall to active duty for the duration of confinement. *See Lull*, opinion at *7–8. We agree with Appellant's interpretation of the AFI. However, we disagree with Appellant's contention that noncompliance is jurisdictional, *see United States v. Bailey*, 11 M.J. 730, 732, n.2 (A.F.C.M.R. 1981) ("[R]egulations cannot diminish the effectiveness of jurisdiction mandated by Congress . . . ."); or that noncompliance renders his confinement unlawful, or that he was prejudiced in a manner that we have jurisdiction to enforce.

receive pay and allowances or earn leave for the two-week period following his court-martial, his dependent daughter was denied military medical benefits, Appellant was placed in AWOL status in his civilian job, and he lost USERRA protections that may have allowed him to return to work after serving his sentence. Appellant's basis for all but the first of these claims is not just that Congress intended reservists to continue in an active duty status for the duration of confinement—for which we find no support in the text of the code as discussed—but also that the intent of Congress was to provide protections for reservists and dependents while the reservist is confined, and reemployment rights upon release.

Appellant provides no evidence to support these claims, much less a case for congressional intent in the text of the UCMJ on which they depend.[24] Even more consequential, each claim of prejudice concerns a matter not directly connected to the approved sentence, and thus we are without jurisdiction to consider them. Article 66(c), UCMJ, grants broad discretion to determine which part of a sentence "should be approved." While we agree that a Court of Criminal Appeals (CCA) has considerable discretion, that discretion is not unlimited. In *United States v. Buford*, we observed that Article 66(c), UCMJ, "does not extend a CCA's reach to all finance or personnel matters that may have some link to a court-martial sentence." 77 M.J. 562, 565 (A.F. Ct. Crim. App. 2017). We find Appellant's claims of prejudice fall short of our jurisdiction to consider them even if there was substantiation in the record that Appellant actually suffered adverse consequences from having his active duty status curtailed while confined. Appellant has similarly failed to present any evidence to establish that any member of his command or other military official curtailed his active duty status to increase the severity of his sentence and impose illegal post-trial punishment. *See id.* at 566.

Thus, we hold that when confinement is adjudged, the UCMJ does not require a reservist to be recalled to active duty status for the duration of confinement as a condition to being lawfully confined. Nonetheless, R.C.M. 204(b)(1) allows for a reservist—and AFI 51-201 establishes a regulatory framework—to be retained on active duty when the order to active duty was approved by the Secretary of the Air Force as it was here. To the extent that AFI 51-201 may have required Appellant's commander to authorize Appellant's continued activation while confined by issuing an AF Form 938, we find the special orders

---

[24] In the case of the Uniformed Services Employment and Reemployment Rights Act (USERRA), entitlement to benefits terminates upon separation with a dishonorable discharge. 38 U.S.C. § 4304(1).

issued by Maj AH did not render Appellant's confinement unlawful, and Appellant has not shown prejudice to a right that this court has jurisdiction to remedy or protect.

### b. Honorable Characterization of Service—DD Form 214

Appellant claims his honorable discharge effective 6 January 2018, also renders his confinement unlawful; and, citing *United States v. Watson*, 69 M.J. 415 (C.A.A.F. 2011), Appellant claims his "honorable discharge remits his unexecuted dishonorable discharge," and that this court should set aside the dishonorable discharge as an appropriate remedy. We are not persuaded by either contention.

Appellant's counsel mischaracterizes Appellant's DD Form 214 as directing Appellant's "discharge" from the reserve component. In fact, the form substantiates Appellant's "release from active duty" upon his "completion of required active service" as shown in blocks 23 and 28.[25] Appellant's reliance on *Watson* is misplaced because his circumstances are readily distinguishable from those of an appellant whose commander issued an "Honorable Discharge" certificate accompanied by an order discharging the appellant from a reserve component that cited service separation policy. 69 M.J. at 421 (reversing decision that affirmed component of sentence that included dismissal).

As a matter of service regulation, the term "release from active duty" as identified on Appellant's DD Form 214 means "[e]nd of active duty status" and applies to "Airmen of Reserve components who revert to inactive status in their Reserve organizations" after serving in an active duty status. *See* AFI 36-3202, *Certificate of Release or Discharge from Active Duty (DD Form 214/5 Series)*, Atch. 1, *Terms* (4 Dec. 2018). Reservists who have been discharged from a reserve component receive a DD Form 256, *Honorable Discharge from the Armed Forces of the United States of America.*[26] Consequently, Appellant's DD Form 214 does not operate to remit Appellant's adjudged dishonorable discharge just as his release from active duty status does not terminate jurisdiction. *See* Article 3(d), UCMJ, 10 U.S.C. § 803(d) (member of a reserve component "is not, by virtue of the termination of a period of active duty . . . relieved from amenability to the jurisdiction of this chapter for an offense against this chapter committed during such period of active duty . . . .").

---

[25] Block 6 shows Appellant having a 31 July 2019 reserve obligation termination date after his court-martial.

[26] There is no evidence before us that Appellant was issued a DD Form 256 with an accompanying order directing his separation or discharge. *See* AFI 36-3209, *Separation and Retirement Procedures for Air National Guard and Air Force Reserve Members*, ¶¶ 1.4.4.2, 1.5 (14 Apr. 2005 Incorporating Through Change 3, 20 Sep. 2011).

Appellant has presented no evidence he was discharged from a component of the Armed Forces, only that he was released from active duty status the day after his court-martial adjourned with an honorable characterization of service for the period beginning on 1 May 2017 through Appellant's release from active duty on 6 January 2018. Contrary to Appellant's claim and understanding, the DD Form 214 did not discharge Appellant from the reserve component effective on 6 January 2018. We decline, therefore, to find Appellant's confinement was unlawful or set aside his adjudged dishonorable discharge on the basis of the honorable characterization of his active duty service as reflected on DD Form 214.

## C. Legal and Factual Sufficiency

### 1. Law

A Court of Criminal Appeals may affirm only such findings of guilty "as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). "Article 66(c) requires the Courts of Criminal Appeals to conduct a *de novo* review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'"

*Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### 2. Analysis

#### a. Sexual Assault

As charged in Specification 1 of Charge I, Appellant was convicted of sexual assault by bodily harm in violation of Article 120(b)(1)(B), UCMJ, 10 U.S.C. § 920(b)(1)(B), which required the Government to prove two elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon NB by penetrating her vulva with his penis; and (2) that Appellant did so by causing bodily harm to NB, to wit: penetrating her vulva with his penis. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(3)(b). "'[B]odily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act." *MCM*, pt. IV, ¶ 45.a.(g)(3). With regard to consent, the statute explains,

> The term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.

*MCM*, pt. IV, ¶ 45.a.(g)(8)(A). The statute also explains that "[a] sleeping, unconscious, or incompetent person cannot consent." *MCM*, pt. IV, ¶ 45.a.(g)(8)(B). "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." *MCM*, pt. IV, ¶ 45.a.(g)(8)(C).

Appellant and NB met and began dating after a squadron Christmas party in early December 2014. On Christmas Day, Appellant and NB were guests at a dinner party in his neighbor's home. NB and Appellant flirted throughout the evening, and NB sent Appellant sexually charged text messages that she testified were "meant for humor." After midnight, NB sent Appellant a "meme" of a provocatively sketched woman telling a man, "ALL I want for Christmas is a hug that results in wild sex." Appellant texted back, "Can I give you a hug?" and NB replied, "Y[es]." NB testified she found the text messages funny and denied they meant that she wanted to have sex with Appellant.

NB intended to spend the night at the neighbor's house and put a change of clothes for the next day in a spare bedroom. She had arrived early and helped prepare the food, and drank what she described was "an excessive amount" of alcohol starting with shots and mixed drinks, and then wine and sangria. As the night went on, NB "essentially black[ed] out and only [had] clips of what went on." NB was observed having trouble talking, she was nodding off at the dinner table, and went to the bathroom to vomit. A guest who assisted NB in the bathroom observed that NB could not express "full thoughts in full sentence[s]." In contrast to NB, Appellant appeared to be sober throughout the evening. Toward the end of the party, NB became emotional and was crying, and initially tried to drive home. Appellant helped her walk across the street to his house because she was unable to walk without assistance due to the amount of alcohol she consumed. Appellant's neighbor watched Appellant assist NB by putting his arm around her waist.

The next thing NB remembered was being on her hands and knees, and Appellant was behind her and penetrating her vagina with his penis. NB testified she was confused and not completely aware of what was happening, and "didn't know what to think of [Appellant] at that point [be]cause [she] thought [she] could trust him." Although they had been sexually intimate with each other earlier in the relationship, NB testified it was the first time Appellant engaged her in sexual intercourse. In the morning, NB awoke in Appellant's bed and both were naked. Appellant asked "are you okay, because it seems like you didn't want that last night?" NB felt the situation was "so surreal, and [she] rolled over because [she] was just trying to understand what happened." Later that morning, NB sent a text message to Appellant asking, "[D]id u enjoy f**king me," and Appellant replied, "Did you enjoy it? It seemed like you didn't want me to . . . ." Several hours later NB replied, "Yes."

After NB testified, the Government called PH, Appellant's previous intimate partner who dated Appellant between the summer of 2013 and spring of 2014, to testify about acts of nonconsensual sexual intercourse with Appellant during their relationship. PH acknowledged there were various times she and Appellant were intimate, and she wanted him to stop because intercourse was painful or uncomfortable. She would "tell [Appellant] to stop, [and] that it was hurting," but he would continue "[u]ntil he came." The military judge admitted this evidence under Mil. R. Evid. 413.[27]

---

[27] After PH testified, the military judge instructed the members that her testimony was for a limited purpose, and that he would give them specific instructions later. After the close of evidence, he instructed that evidence Appellant may have committed sexual offenses against PH may be considered for its bearing on any matter to which it

Appellant contends that NB, while impaired by her consumption of alcohol, was not incapable of consenting due to intoxication, and thus Appellant's conviction is legally and factually insufficient. For support, he argues NB was engaged in sex with Appellant on her hands and knees, and because she was supporting her own weight, Appellant could not have committed the act without her participation and, thus, consent. Further, Appellant argues there was no evidence NB revoked consent or objected when she realized she was having sex with Appellant; and evidence that NB had initiated a text conversation about their encounter later that morning demonstrates she had a memory of the sexual encounter, and by inference, that she was sufficiently aware to be capable of consenting.

The sufficiency of the conviction for sexual assault turns on whether the Government proved beyond a reasonable doubt that NB did not consent to sex on the night of the Christmas dinner. We find the circumstances demonstrate that a rational factfinder could have found no "freely given agreement to the conduct at issue by a competent person." *MCM*, pt. IV, ¶ 45.a.(g)((8)(A). NB was falling asleep at the dinner table, slurring her words, required assistance to throw up in the bathroom, and required Appellant's assistance in walking to his home. We also consider that Appellant was charged with assaulting NB by causing her bodily harm—and not by assaulting her while she was incapable of consenting—which means the question is not if NB *could* consent, but if she *did* consent. On these facts, a rational factfinder could have found that Appellant did not have NB's freely given agreement to sexual intercourse, and thus the Government proved the offense of sexual assault beyond a reasonable doubt.

If shown by some evidence, mistake of fact as to consent is a defense to sexual assault. *See* R.C.M. 916(j)(1). It requires that an appellant, due to ignorance or mistake, incorrectly believed that another consented to the sexual conduct. *See id.* To be a viable defense, the mistake of fact must have been honest and reasonable under all the circumstances. *See id.*; *see also United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F 1995)). A rational factfinder could find Appellant's text message to NB after the sexual assault, and PH's testimony admitted under Mil. R. Evid. 413, was sufficient to prove Appellant was not reasonably mistaken as to consent.

---

was relevant, to include its tendency, if any, to show that Appellant had a propensity to engage in sexual offenses, but that evidence of another sexual offense on its own was insufficient to find Appellant guilty of sexual assault of NB.

Viewing the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of the offense of sexual assault as charged in Specification 1 of Charge I, and that the evidence is legally sufficient to support Appellant's conviction. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient

### b. Stalking

As charged in the sole specification of the Additional Charge, Appellant was convicted of stalking NB, in violation of Article 120a, UCMJ, which required the Government to prove three elements beyond a reasonable doubt: (1) that Appellant wrongfully engaged in a course of conduct directed at NB, in that he repeatedly maintained visual and physical proximity to her home and place of work and conveyed threats by words and conduct[28] that would cause a reasonable person to fear bodily harm to herself or members of her immediate family; (2) that Appellant knew or should have known that NB would be placed in reasonable fear of bodily harm to herself or members of her immediate family; and (3) that Appellant's acts induced such fear in NB. *See MCM*, pt. IV, ¶ 45a.b. "The term 'repeated,' with respect to conduct, means two or more occasions of such conduct." *MCM*, pt. IV, ¶ 45a.a.(b)(2). The term "immediate family" includes a "sibling of the person." *MCM*, pt. IV, ¶ 45a.a.(b)(3).

NB's home was a second-floor apartment about 40 minutes from Appellant's house and only a mile from a federal facility where she worked. Beginning in January or early February 2015, Appellant would stand in a courtyard and look for shadows on her kitchen, dining room, and living room windows to see if NB was alone. Appellant entered her apartment "a few times after he thought he witnessed [NB] with somebody else" and told NB he was watching her. In addition, Appellant sat in his truck outside of NB's place of work or

---

[28] In a separate assignment of error raised for the first time on appeal, Appellant claims the specification fails to state an offense because it does not allege that Appellant's acts were directed "to a specific person." We disagree and find no merit to the issue. The "course of conduct" charged by the Government essentially duplicates and combines two different statutory definitions for the term, to wit: "repeated maintenance of visual or physical proximity to a specific person," or "a repeated conveyance of verbal threat, written threats, or threats implied by conduct, or a combination of such threats, directed at or toward a specific person." *MCM*, pt. VI, ¶ 45a.a.(b)(1). The specification either expressly or by necessary implication includes every element of the offense, to include that Appellants acts were directed at NB. *See United States v. Tuner*, 79 M.J. 401, 403 (C.A.A.F. 2020).

along an adjacent highway where Appellant could see if NB was at work, and whom she was with when she left. There were occasions when security personnel at the facility would call NB at work and tell her that Appellant was in the parking lot, and that she needed to tell Appellant to leave because he was parked on private property. NB testified that one time she went to the parking lot to tell Appellant to leave because he was on federal property, and Appellant told her "he can go wherever he wanted to" because "he was DoD." Seeing Appellant parked at her place of work made NB scared, and she "felt hopeless because [she] couldn't get away."

Appellant frequently sat in his black pickup truck outside NB's apartment to see if she was alone and if she brought anyone home with her when she left work. NB described sitting in her living room watching TV and being aware of Appellant's presence from the sound of his truck engine idling in the parking lot. The sound was "chilling" and "[her] stomach would ache knowing he was there."[29] Out of concern for her safety, NB set up an emergency plan with a coworker who lived five minutes down the road and could come to her home if she needed help. NB's neighbor told NB he was concerned for her safety because he often saw a man watching her from inside a black pickup truck parked outside her apartment. The manager of the apartments testified that NB once told her about a gentleman with whom she had been in a relationship and "[was] having difficulties," who was "watching her apartment" while parked across the street at a business and "possibly even in the parking lot of the [apartment] property." NB asked the manager to keep an eye out for Appellant's vehicle.

NB described an incident in January or February 2015 when NB's sister and her three young sons stayed overnight at NB's home. While NB and her sister stayed up late talking and watching TV as the children slept, NB heard Appellant's truck once more, and she ran to look outside her bedroom window. As soon as NB saw Appellant, she gave her sister the phone to call NB's coworker and heard a loud banging at her door. Appellant was yelling, "who the f[**]k's in there? I know you're with another f[**]king guy, who is he[?]" and tried "to push the door in" and gain access to her home. NB pushed back at first, but then quickly stepped out of her apartment and told her sister to lock the door behind her. When Appellant left and NB came back inside she found her sister was so frightened by Appellant's behavior that she was holding

---

[29] NB testified she "was afraid of the presence that that truck brought." On cross-examination, trial defense counsel illustrated the complexity of NB's relationship with Appellant; later in the relationship, NB told Appellant she missed riding in the truck and sent the text, "Every truck I hear[,] I hope it's you."

a 12-inch knife to protect herself and her children in the event that Appellant made his way into the apartment.

NB's sister witnessed Appellant's attempt to force entry into NB's home, and her testimony was consistent with NB's testimony on all material points. She heard the intruder yelling "really loud," "I know you're in there F-ing someone. Who the F . . . are you with?" NB's sister "was scared to death. [Her] heart was pounding out of [her] chest," and she was afraid that she, her children and NB would be harmed. She explained that NB had told her about Appellant's behavior and NB "would get really stressed out and anxious" when she heard the sound of Appellant's truck. NB had dismissed her sister's suggestions to report Appellant's abuse or end the relationship "because [NB] thought he was going to come after her if she tried to take preventative measures."

The coworker with whom NB set up an emergency plan recalled the night he received a phone call from NB's sister who "sounded very distraught" as she related that someone "was trying to break into" NB's apartment. After he received the call he got into his vehicle and headed straight to NB's apartment, but by the time he arrived the individual had left. The coworker had a "very high" opinion of NB's character for truthfulness, and though he had never met much less confronted Appellant, he "knew him by his truck," "[a] black pickup with tinted windows" that NB told the coworker would follow her to and from work. The coworker recognized a picture of Appellant's truck shown to him by trial counsel that looked like the truck he saw "[f]our or five times" along the side of the road that runs by the federal facility where he and NB worked.

NB disclosed Appellant's behavior, including the incident that NB's sister witnessed in NB's home, to Appellant's neighbor with whom NB was friends. The neighbor recalled NB telling her "there was an incident at [NB's] apartment where they were arguing, and [NB] was trying to shut the door, and [Appellant] pushed his way in." The neighbor also testified that NB mentioned to her several times "that there were occasions where [NB] would be coming out of work and [Appellant] would be there" even though they had no plans to meet. "And then a fight would ensue that she was cheating on him with whomever she was walking out with."

By the time of the incident witnessed by NB's sister, NB had "tried to leave [Appellant] multiple times but [Appellant] made it clear to [NB] that [she] d[id]n't get to make that call and it would be his choice for [their] relationship to end." NB "went along with this because every time [she] would try to end [their] relationship [Appellant] would increase the harassment." She testified it was less stressful and scary to stay in a relationship with Appellant, to do what he said for her to do, and act how he wanted her to act, "because his anger was so out of control and [she] couldn't handle the harassment and abuse anymore." NB also stayed with Appellant because she loved him. She "wanted to

believe the best in him" and "wanted him to be the person that [she] thought he was." "And so, it just came to a point where staying with him, playing along, keeping him happy, was the easiest way to survive for [her]."

Evidence at trial from multiple witnesses corroborated key aspects of NB's account of Appellant's conduct and resolutely established that Appellant committed the charged stalking offense beyond a reasonable doubt. A rational factfinder could find implied threats to do harm during the incident in which Appellant tried to push his way into NB's home, incensed by an unwarranted belief that NB was with another man. A factfinder might find that Appellant conveyed threats by words and conduct on this occasion that caused NB to fear bodily harm not just to herself, but also to her sister who met the statutory definition of a member of NB's immediate family.

Appellant contends the Government's proof fails because there was "only one time that Appellant came to NB's apartment uninvited," and that proof of the offense requires a demonstration that Appellant's acts were repeated, meaning they were done on two or more occasions. Appellant argues the one time Appellant tried pushing his way into NB's home belies repeated acts in a course of conduct that are necessary to prove stalking. However, the "physical proximity" the Government proved reached beyond the exterior door to NB's apartment but still close enough that NB frequently identified Appellant or his truck in the parking lot or courtyard from the windows of her home, or when he parked along the highway or in the parking lot at her place of work.[30] NB testified that on some occasions Appellant acknowledged watching her, and he would enter her home if he believed she had a visitor. The testimonies of NB's sister, coworker, the apartment manager, and Appellant's neighbor lend credence to NB's testimony that Appellant frequently parked his truck near NB's home and place of work and watched for signs that NB was with others. On these facts a rational factfinder would have little difficulty finding Appellant's conduct was repeated.

The evidence given by the four witnesses also lend credence to NB's testimony that Appellant's acts induced reasonable fear in NB of bodily harm to herself and her sister. Further, a rational factfinder could infer that Appellant

---

[30] Appellant contends on appeal that it was "impossible for Appellant to maintain 'visual or physical' proximity to NB when she was inside" her workplace, "and there was no evidence of the distance of Appellant's location to the facility" where she worked. Even so, a rational factfinder could find Appellant's presence within sight, and near the location, of her workplace when she was arriving or leaving was sufficient proximity without proof of the actual distance of Appellant's parked truck. It stands to reason that actual distance is just one measure of proximity. NB and her coworker testified about specific locations where they observed Appellant's parked truck, which is sufficient.

knew or should have known that NB would be placed in such fear. Appellant contends that NB's decision to confront Appellant face-to-face outside the safety of her apartment after instructing her sister to lock the door behind her shows that "NB was not a 'reasonable' person, and therefore was not 'reasonably' in fear of death or bodily harm." Appellant also contends the Government's proof is undermined by evidence that NB continued to date Appellant and seek an exclusive relationship with him. We disagree that either contention affects legal or factual sufficiency. A rational factfinder would not have misgivings about NB's explanation that she confronted Appellant outside her home because she "wanted [Appellant] away from [her] nephews, and [she] would rather be outside [her home] than him inside where [her] family was." We decline to accept Appellant's reasoning that NB showed no fear for her personal safety by confronting Appellant in the manner she did. The fundamental flaw in Appellant's reasoning is that it mistakes courage for absence of fear.[31] A rational factfinder could understand NB's testimony that she both loved and feared Appellant, and that she felt safer remaining in, rather than ending, an abusive and controlling relationship.

Lastly, Appellant argues the Government failed to prove Appellant's conduct was "wrongful" because Appellant did not trespass at NB's apartment complex, and they continued to communicate and spent time together during the charged timeframe. We are not persuaded either circumstance provides legal justification or authorization for Appellant's conduct or defeats the Government's proof that Appellant's conduct was wrongful. More generally, we are not convinced by the argument that a conviction for stalking cannot be maintained if an appellant is "in a place he was legally allowed to be, which makes his conduct not 'wrongful,'" as Appellant contends it should.

If Appellant's contentions were true, a person subject to the UCMJ would escape accountability for crimes requiring proof of a wrongful act committed in a place he is legally allowed to be, such as his home, at work, or in a public place. It seems highly unlikely that Congress, in requiring the Government to prove an appellant had no legal justification or authorization for his acts, intended to preclude commanders from disciplining conduct in all but the narrowest of circumstances. If Appellant's contention was correct, only a trespasser could be held to account for wrongful acts. However, we need look no further than the statutory element that Congress requires the Government to prove here: a "course of conduct directed at a specific person." Proof of a course of conduct does not also require proof of trespass, and there is no statutory defense that apparent lawful presence and due regard for the legal rights of

---

[31] "Bravery is the capacity to perform properly even when scared half to death." Omar N. Bradley.

third parties while engaged in acts constituting a proscribed course of conduct against a specific person are exonerating. We are not at liberty to give new meaning to a term used in an element of an offense beyond its clear, statutorily supplied definition, and we decline to do so now. *See United States v. Lee*, 2017 CCA LEXIS 185, at \*15–16 (A.F. Ct. Crim. App. 14 Mar. 2017) (unpub. op.) (citation omitted) (rejecting application of Fourth Amendment doctrine to define "reasonable expectation of privacy" in Article 120c, UCMJ, different from its statutory definition). Thus, we reject Appellant's contention that his actions were legally justified or authorized and not wrongful.

Viewing the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of the offense of stalking as charged in the Specification of the Additional Charge, and that the evidence is legally sufficient to support Appellant's conviction. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient.

### c. Assault Consummated by a Battery

As charged in Specification 1 of Charge II, Appellant was convicted of assault consummated by a battery of NB in violation of Article 128, UCMJ, which required the Government to prove two elements beyond a reasonable doubt: (1) that Appellant did bodily harm to NB, and (2) the bodily harm was done to NB with unlawful force or violence by strangling her with his arm. *See MCM*, pt. IV, ¶ 54.b.(2); *see also United States v. Johnson*, 54 M.J. 67, 69 (C.A.A.F. 2000). To constitute an offense, the act "must be done without legal justification or excuse and without the lawful consent of the person affected." *MCM,* pt. IV, ¶ 54.c.(1)(a). "'Bodily harm' means any offensive touching of another, however slight." *Id*.

In January 2015, Appellant and NB watched TV while sitting on a couch in NB's apartment as NB drank a second glass of wine. As NB lay down with her head on Appellant's lap, and without apparent provocation, Appellant slid his right arm around NB's neck and grabbed onto his arm with his left hand in a chokehold, tightening his grip. NB felt Appellant choking her and grabbed for Appellant's hand before she passed out. When NB came to, she had urinated on the couch and was terrified "because [she] didn't know what happened." Appellant asked NB, "[W]hat did you do[?]" and tried to make NB "believe it was [her] fault because [she] drank two glasses of wine." NB "couldn't figure it out because [Appellant] was saying that [she] drank too much," but she "knew [she] hadn't," and the incident "just happened so fast." NB got up from the

couch and ran to the bedroom because she "didn't want [Appellant] to hear [her] because [she] was scared."

As part of its proof, trial counsel elicited testimony from the same coworker who responded to the incident when Appellant tried to push his way into NB's apartment. The coworker testified he asked NB about bruises he saw around her neck as well as on other parts of her body.[32] NB told him the bruises around her neck were from when "she got choked out" by her boyfriend, and NB was "very distraught" as she related to him what had happened. The coworker encouraged NB to report Appellant's conduct to the police but NB told him "she couldn't because [Appellant] had friends at the police department."

Trial counsel also introduced evidence under Mil. R. Evid. 404(b) of an incident almost a year later in December 2015 in which the factfinder could conclude that Appellant strangled NB when he stood behind her in a shower and NB passed out and fell to the floor. In addition, Appellant's previous intimate partner, PH, testified to incidents of Appellant strangling her until she passed out during sexual activities with Appellant that were also admitted under Mil. R. Evid. 404(b).

Appellant argues the evidence is insufficient because NB was not a credible witness and "[t]here was no independent, objective evidence corroborating her claim that Appellant put her in a 'chokehold.'" Appellant contends there are no text messages from NB in which she accuses Appellant of choking her, and argues that NB "conflated" the January 2015 allegation that was charged with her allegation that Appellant choked her in the shower in December 2015. In the alternative, Appellant argues for the first time on appeal that because there were inmates at the federal facility where she worked, "NB needed to improve her use of force skills in repelling threats." Appellant further contends, "If Appellant did in fact put her in a 'chokehold,' the evidence suggests he did so for the purpose of helping her improve her use of force skills to protect herself at work," which provides legal justification for Appellant's action in strangling NB as she lay on the couch in her home.

We conclude a reasonable factfinder would find NB's testimony and the supporting evidence both probable and convincing beyond a reasonable doubt. NB's testimony was proof of each of the elements of the offense, to include that Appellant did bodily harm to NB with unlawful force or violence by strangling her with his arm. Other evidence lends support to her testimony and proof of the charged offense, including the coworker's testimony that he observed

---

[32] NB's coworker testified he saw the bruises "towards the end" of the two years that NB worked at the federal facility, which was around the time "when she was getting ready to leave." NB's testimony established she left around mid-March 2015.

bruises around NB's neck, and NB's explanation to her coworker that the bruises were caused by her boyfriend who choked her. NB had no difficulty distinguishing the charged incident when she lay on the couch in her home watching TV and drinking wine from the uncharged incident when Appellant choked her from behind in a shower at a school where she was attending training. There is no evidence in the record, much less any reasonable inference from the evidence, that Appellant's purpose was to improve NB's skill in protecting herself from inmates, or that NB was aware of such an unlikely purpose and consented to being strangled. The evidence admitted under Mil. R. Evid. 404(b) made it more probable that Appellant's intent and motive was to assert physical control and dominance and not the benevolent purpose Appellant conceives in his appeal.

Viewing the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of the offense of assault consummated by a battery as charged in Specification 1 of Charge II, and that the evidence is legally sufficient to support Appellant's conviction. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient.

## D. Admissibility of Uncharged Acts under Mil. R. Evid. 404(b)

Appellant challenges the military judge's rulings denying his motion to suppress various instances of Appellant's conduct with NB, and with a prior intimate partner, PH, that were admitted as a crime, wrong, or other act under Mil. R. Evid. 404(b). We find the military judge did not clearly abuse his discretion in admitting this evidence.

### 1. Law

A military judge's ruling under Mil. R. Evid. 404(b) and Mil. R. Evid. 403 will not be disturbed except for a clear abuse of discretion. *United States v. Morrison*, 52 M.J. 117, 122 (C.A.A.F. 1999) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008) (per curiam)).

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is not admissible as evidence of the person's character in order to

show the person acted in conformity with that character on a particular occasion, and cannot be used to show predisposition toward crime or criminal character. However, such evidence may be admissible for another purpose, including to show motive, intent, plan, absence of mistake, or lack of accident. Mil. R. Evid. 404(b)(2); *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (citation and footnote omitted). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989).

We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b): (1) Does the evidence reasonably support a finding by the factfinder that Appellant committed other crimes, wrongs, or acts? (2) Does the evidence of the other act make a fact of consequence to the instant offense more or less probable? and (3) Is the probative value of the evidence of the other act substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403? *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989).[33] "If the evidence fails to meet any one of these three standards, it is inadmissible." *Id.*

**2. Analysis**

The military judge allowed the Government to introduce evidence of Appellant's acts under Mil. R. Evid. 404(b), and explained his decision in a written ruling. On appeal, Appellant challenges admission of evidence that he (1) strangled NB a second time later in the year when he was behind her in the shower; (2) made statements to others about being married to NB; (3) concealed his identity when he made "spoofed" phone calls to NB; and (4) choked PH and entered her residence without permission. We consider each challenge in turn.

#### a. Strangling NB in December 2015

Trial counsel introduced evidence of an incident during the Christmas holiday in December 2015 when Appellant strangled NB in the shower at an in-residence school that NB attended in Georgia. Evidence showed the incident occurred just over ten months after the timeframe charged by the Government for the offense of unlawfully strangling NB that was charged as assault consummated by a battery. NB made a statement to a classmate shortly after it happened, which resulted in the classmate reporting Appellant's conduct to an

---

[33] Appellant contends that a military judge must articulate consideration of eight *Berry* factors in testing for legal relevance under Mil. R. Evid. 403 and the third prong of *Reynolds*, and that the military judge's failure to do so in Appellant's trial "renders his conclusions of law erroneous." *See United States v. Berry*, 61 M.J. 91, 95–96 (C.A.A.F. 2005); *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000)). We find the military judge's reasoned analysis on the record satisfies Mil. R. Evid. 403, and we decline to find error on the basis that the military judge was obligated to articulate each of the non-exhaustive *Berry/Wright* factors in his ruling.

instructor at the school, and precipitated an investigation of Appellant's conduct with NB.

The evidence showed that Appellant visited NB during a break in her law enforcement training for the Christmas holiday. During Appellant's visit, they took an overnight trip to Florida and, according to NB, they "argued the whole time" "about everything." When they returned to Georgia and were both relaxing in bed watching TV in her dorm room, NB went to take a shower and Appellant followed her to the bathroom. As Appellant stood behind her in the shower, he put his right arm around her neck and grabbed onto his arm with his left hand and "clinched in tight." NB "felt pressure" and "began to panic." She collapsed "unconscious" to the ground as she reached to grab Appellant's arm with her hands. When she regained awareness, the water was turned off and she lay on the shower floor as Appellant stood over her. NB was "absolutely terrified," relating she had heard stories about "how your life flashes before your eyes" "when you're dying," "and that's exactly what . . . had happen[ed]" to her.

NB got out of the shower, fell to the bathroom floor, and cried. She testified at trial that Appellant "was just laughing, [and] so proud of himself," describing how she had "la[in] on the ground convulsing." NB told Appellant she could not understand why he did that. Appellant replied he wanted to show her that "he was capable of taking [her] life" "if he ever wanted too [sic]," but also "knew [she] wouldn't die." Appellant also told her that if she was not scared from what she saw in her head when she was passed out then she "should probably try to go see a psychiatrist because [she] probably ha[s] issues."

NB was afraid to report Appellant's conduct to the police, explaining in her testimony at trial that she "just tried to make it better—just tr[ied] to make [Appellant] happy. . . . [and] to get away from the negative. As long as he's happy, life is easy." Despite her apprehension, NB shared details of the incident with a classmate whose testimony was admitted as a prior consistent statement. The classmate related how Appellant "attacked her while she was taking a shower, and he choked her from behind." Appellant "was standing over top of her and said that he had that much control over her and that he could end his life or her life whenever he wanted." The classmate described NB was "pretty distraught," "upset," "shaken," and "obviously affected by" what happened to her. Although NB "didn't want to bring her personal life into the training environment in the school that [they] were in," the classmate reported the incident to one of their instructors at the school, which initiated an investigation.

The military judge allowed the Government to introduce evidence under Mil. R. Evid. 404(b) that in December 2015 Appellant strangled NB in the shower and then communicated a threat against her life. Applying the first

*Reynolds* prong—whether the evidence reasonably supports a finding by the factfinder that Appellant engaged in other acts—the military judge found "sufficient evidence to support a finding by a panel that [Appellant] committed this act." We find the military judge's fact-finding on the first *Reynolds* prong was supported by the evidence of record including a prior consistent statement NB made to a classmate. Thus, we conclude that the military judge properly applied the first *Reynolds* prong.

Applying the second *Reynolds* prong—whether evidence of the other acts makes a fact of consequence to the instant offenses more or less probable—the military judge found that the choking incident in December made it more probable that Appellant "had the intent and motive to exercise physical control and dominance over NB" for the charged offense of assault consummated by a battery early in their relationship when Appellant allegedly strangled NB as she lay on a couch with her head in his lap. The military judge further found that the later incident in December showed a "common technique to the charged incident" and that it "also tend[ed] to support NB[']s statements regarding her fear of the accused."

The military judge correctly applied the second *Reynolds* prong. A fact of consequence in this litigated case was whether Appellant did bodily harm to NB with unlawful force or violence. *See MCM*, pt. IV, ¶ 54.b.(2). As discussed earlier, "'[b]odily harm' means any offensive touching of another, however slight." *MCM*, pt. IV, ¶ 54.c.(1)(a). Appellant's defense at trial was that NB fabricated the incident of Appellant choking her as she lay on a couch. The Defense essentially argued that the members should find the incident was improbable because it was unusual.[34] Consequently, evidence that Appellant wanted to show NB that he was capable of ending her life provided a motive for why Appellant committed the charged offense under circumstances in which the factfinder might otherwise conclude there was no apparent provocation or reason. The December incident was further evidence of Appellant's intent to exert control and dominance over NB when they were together. Thus,

---

[34] Later in findings argument, Appellant defended against the charged offense of assault consummated by a battery by challenging NB's credibility and sowing doubt that her account of what Appellant did to her was believable. The Defense remarked how "[i]t is early in the relationship," the two were supposedly just "sitting on the couch watching stuff, and [Appellant] just randomly does it to exercise control." The Defense characterized NB's account of what Appellant did to her as "[o]ut of nowhere," "bizarre," and "some sort of like exhibition of dominance." The Defense implied that NB's account was dubious and unconvincing by rhetorically asking, "So, [Appellant] chokes her to show that [he] can control her?" The Defense suggested that "[t]here is no actual evidence of this event. There [are] no photographs of injuries. There is no medical evidence."

evidence that Appellant strangled NB in December when a motive was evident strengthened the inference that Appellant committed an offensive touching with unlawful force or violence and made the act underlying the charged offense earlier in their relationship more probable. *See, e.g., United States v. Watkins*, 21 M.J. 224, 227 (C.M.A. 1986) (holding prior acts are admissible which reasonably could be viewed as "the expression and effect of the existing internal emotion" and "the same motive [is] shown to have existed in appellant at the time of the subsequently charged acts").

Applying the third *Reynolds* prong, which the military judge found was the most critical prong, the military judge determined that the probative value of the December incident was not substantially outweighed by the danger of unfair prejudice to Appellant under Mil. R. Evid. 403. In making this determination, the military judge "considered the similarities between this uncharged event and the charged event and the severity of the uncharged event." The military judge shared Appellant's concern that "a factfinder might conflate or confuse the two events." However, the military judge found "these dangers do not substantially outweigh the strong probative value of the evidence, specifically relating to motive, intent, common plan, and absence of mistake," and "[t]he facts surrounding the uncharged event support the [G]overnment's theory that [Appellant] sought to express physical domination or control over NB."

The military judge correctly applied the third *Reynolds* prong. Consistent with his determination, the military judge gave the members an appropriate limiting instruction after NB's testimony about the incident in December 2015 and again before closing arguments by counsel.[35] The findings instruction allowed the members to consider the evidence that Appellant may have committed an offense against NB while she was at the in-residence school in 2015, "specifically strangling her and threatening her" for the limited purpose of "its tendency, if any, to show on the part of [Appellant,] motive or intent to dominate and/or control [NB] or to show a common plan or absence of mistake with regard to Specification 1 of Charge II." Thus, as to the third *Reynolds* prong, we find the military judge properly applied the Mil. R. Evid. 403 balancing test and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

---

[35] NB testified about the choking incident toward the end of her direct examination, after which the military judge instructed, "I do want to instruct the panel with respect to the alleged assault which allegedly occurred in late December of 2015." He explained, "That assault is not on the charge sheet. You may use evidence of that assault for the limited purpose, to show motive, intent, or common plan. And I will give you more specific instructions on how you can use the evidence of that particular assault."

We conclude that the military judge properly applied the *Reynolds* test and his ruling was not a clear abuse of discretion. Accordingly, we hold that the military judge did not err in admitting evidence that Appellant strangled NB in the shower and then communicated a threat against her life in December 2015.

### b. Statements about being Married to NB

Trial counsel introduced evidence that Appellant wore a wedding ring and that he told and urged NB to tell others that he and NB were married. One time in December 2015 when Appellant was away from NB on temporary duty to San Antonio, Texas, he talked to NB on a speaker phone in a vehicle with others present. During the car ride, Appellant told NB "they don't believe that we're married. Tell them we're married." A witness who was a passenger in the vehicle testified "[t]he female sounded somewhat irritated . . . [and] would not answer the question that [Appellant] was married or not." On a second occasion while Appellant was at a deployed location, he spoke to NB on a speaker phone with others listening and "kept encouraging [NB] . . . [to] tell them [they were] married." NB testified she benefited from Appellant wearing a wedding ring and telling others they were married because she wanted to have a monogamous, committed relationship with Appellant. Evidence was also adduced at trial that NB told a classmate that Appellant was her husband.

The military judge allowed the Government to introduce this evidence under Mil. R. Evid. 404(b). Applying the first *Reynolds* prong, the military judge found sufficient evidence to support a finding that Appellant told others he was married to NB. We find the military judge's fact-finding on the first *Reynolds* prong was supported by the evidence of record and not clearly erroneous.

Applying the second *Reynolds* prong, the military judge found the evidence "probative of [Appellant]'s strong feelings toward NB and his alleged desire to prevent others within his unit from viewing NB as being available for dating." The military judge found further "it to be probative of a motive by [Appellant] to express control over NB to other individuals." We find the military judge correctly applied the second *Reynolds* prong. Two facts of consequence in this contested findings case were whether Appellant engaged in the acts underlying the charged assault consummated by a battery and stalking offenses. That Appellant urged NB falsely to portray she was committed to Appellant in marriage, is some evidence of Appellant's motive and intent to exert control over NB, which the factfinder could rely on to find some evidence of these facts of consequence, though the probative value was modest.

Applying the third *Reynolds* prong, the military judge found "the probative value of establishing [Appellant]'s attitude and feelings toward NB is not substantially outweighed by unfair prejudice," and "there is minimal danger of

unfair prejudice" because Appellant's "statements do not constitute a crime and for many people would not even be considered per se 'misconduct.'" We find the modest relevance of the evidence was not substantially outweighed by the danger of unfair prejudice. We agree with the military judge's determination and conclude he properly applied the *Reynolds* test and his ruling was not a clear abuse of discretion.

### c. Spoofed Phone Calls to NB's Cell Phone

On appeal, Appellant challenges the admission of evidence that tended to show that Appellant made "spoofed" calls to NB's phone. The phone calls NB received generally fall into three periods, chronologically: phone calls NB received during the charged timeframe for the stalking offense between January and March 2015 that went unchallenged at trial; phone calls NB received between September and October 2015 that also went unchallenged at trial; and phone calls NB received near the end of the year when NB attended in-residence training in Georgia.

With regard to this last period, the Government provided pretrial notice to the Defense under Mil. R. Evid. 404(b), that it intended to introduce evidence of numerous phone calls and voice messages from Appellant to NB "between on or about 20 November 2015 and 10 January 2016," while she attended the in-residence school in Georgia. The calls and messages occurred just over eight months after the end of the charged timeframe for the stalking offense. The Government's notice included that Appellant used a "spoofing" application to conceal his identity when he placed calls to NB's cell phone. Appellant objected to the admission of this evidence in a pretrial motion.

The military judge found sufficient evidence that Appellant used a spoofing application to contact NB when she was in Georgia, but the probative value of the evidence was diminished because the communications were "several months after the charged timeframe for the stalking specification." The military judge also found the probative value was lessened because of unspecified "evidence presented by the [D]efense showing the context of certain communications between [Appellant] and NB." The military judge noted that using a spoofing application was not illegal, but evidence that Appellant used one several months after the charged timeframe for the stalking offense may be a waste of time or confusing under Mil. R. Evid. 403. Ultimately, the military judge excluded the evidence, concluding that its admission "could quickly turn into a mini-trial to establish evidence of questionable relevance." The military judge explained,

> Considering the *Reynolds* test and [Mil R. Evid.] 403, I do not intend to allow the [G]overnment to introduce *detailed evidence*

> *of the accused's communications* to NB as outlined above. How-
> ever, I will reconsider this ruling depending upon how evidence
> is presented at trial and encourage the parties to discuss
> whether evidence of such communications not reasonably in dis-
> pute could be admitted in a summary fashion allowing both sides
> to discuss relevant aspects of the interactions between [NB] and
> the accused during this timeframe.

(Emphasis added).

Appellant claims trial counsel violated the ruling by introducing evidence from NB's classmate who related highlights of a 30-minute phone conversation he had with NB in January 2016. The classmate summarized the conversation in a narrative that included NB expressing concern about Appellant's "possible spoofing of her phone" while she was at the school, which was within the timeframe covered by the military judge's ruling; however, trial counsel elicited no details about those communications. NB did not testify about spoofed phone calls from Appellant that the members could attribute to the 20 November 2015 through 10 January 2016 timeframe covered by the ruling. She explained that on indeterminate occasions "[i]f we were together, if I was with him, he wouldn't do the scary things like spoof calls . . . ."

Trial counsel introduced evidence without objection that NB received spoofed phone calls from Appellant during two timeframes that were earlier than the timeframe covered by the military judge's ruling. The first of these timeframes were calls Appellant made to her phone during the charged timeframe of the stalking offense, which NB acknowledged occurred between "January and March" 2015. NB testified that Appellant would "spoof" her sister's phone number so that NB's phone would show her sister's name, picture, and full name when Appellant called NB's phone. Appellant's actions scared her and contributed to her stress. NB believed Appellant used a "spoof app" so that she could not easily block his calls. The second timeframe was in September or October 2015, after the end of the charged timeframe for the stalking offense, that included time when Appellant was deployed. On redirect examination, and without objection, trial counsel introduced a prior written statement NB made to authorities[36] in which NB explained that, during this time, Appellant was still able to contact her even though she "blocked" him on Facebook and on her cell phone. Appellant

> started to call [NB] through blocked numbers and leave [her]
> messages. He would call [NB] through a spoof app which would

---

[36] Prosecution Exhibit 11 is a written statement NB made as a student at the in-residence school she attended in late 2015 into early 2016.

route his calls through another person[']s name and number, so
that [she] would answer. [NB] finally had to set up a plan that
people text [her] before they call [her] so that [she] kn[e]w it
[wa]s really them and not him. He would call as much as 30
times a day and leave voicemails. While he was blocked, he
found ways to harass [her] through [S]kype and text message.
[NB] felt like no matter what [she] would do, [she] couldn't get
away from him.

On appeal, Appellant challenges "[e]vidence of 'spoofed' phone calls from
Appellant to NB," contending that "[t]he military judge ruled this evidence was
inadmissible," but "NB testified about 'spoofing' anyway, and trial counsel en-
couraged her to give details." Appellant contends the "military judge should
have immediately interrupted the testimony on this issue, instructed the panel
members to disregard that testimony, and admonished NB, the witness, and
trial counsel for testifying about conduct that was ruled inadmissible." We con-
sider Appellant's challenges to the evidence in the order in which the evidence
tended to showed that Appellant made the "spoofed" calls to NB's phone.

### i) Spoofed Phone Calls during the Charged Timeframe for the Stalking Offense

NB's testimony about spoofed phone calls she received between January
and March 2015 went unchallenged at trial, and were facts and circumstances
of the stalking offense. Generally, evidence that is inextricably related in time
and place to a charged offense does not come under the purview of Mil. R. Evid.
404(b) and is admissible as part of the *res gestae* of the crime. *See United States
v. Metz*, 34 M.J. 349, 351–52 (C.M.A. 1992); *United States v. Thomas*, 11 M.J.
388, 392–393 (C.M.A. 1981). These calls put stress on NB because they scared
her even though they were not spending time together. Because evidence of the
spoofed calls during the charged timeframe was not subject to the military
judge's ruling and was relevant to the charged stalking conduct, there is no
error in its admission under any standard of review.

### ii) Spoofed Phone Calls after the Charged Timeframe

Appellant did not object to evidence tending to show spoofed phone calls
Appellant may have made to NB's cell phone in September or October 2015
before the timeframe of the military judge's ruling excluding such evidence and
we decline to grant relief. Under any standard of review, we find Appellant was
not prejudiced by admission of other incidents of spoofing after the members
received evidence of spoofing during the charged timeframe for the stalking
offense.

Regarding the witness's succinct testimony that NB was concerned about
Appellant's "possible spoofing of her phone" during the timeframe covered by

the military judge's ruling, we assume error for the sake of argument. Again, Appellant has failed to demonstrate prejudice. Trial counsel presented no evidence of the substance of any spoofed phone calls NB received during the timeframe covered by the military judge's ruling. Assuming the military judge's ruling forbidding trial counsel from eliciting testimony of "*detailed* evidence of [Appellant]'s communications to NB" was violated, the predicate for his ruling was not unfair prejudice but concern about wasting time and confusing the issues, neither of which is apparent from the record. (Emphasis added). Assuming admission of the evidence was error, we find it did not have a "substantial influence on the members' verdict in the context of the entire case." *United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F. 2007) (citations omitted).

### d. Choking PH and Entering her Residence without Permission

Trial counsel introduced evidence of Appellant's conduct during an intimate relationship he had with PH before his relationship with NB, including acts of strangulation of PH and entering PH's residence without her knowledge or permission.

PH testified she and Appellant met in the summer of 2013 and were in an intimate relationship until it ended in the spring of 2014. During their relationship, which ended less than a year before Appellant's relationship with NB began, Appellant had strangled PH to the point of passing out when they engaged in sexual activities. After the first incident, Appellant then "choked out" PH "[w]henever he felt like it," even after PH told him she did not like it; and, "[t]here were times that he did it, and [she] didn't know he was going to do it." PH testified there were "many instances" when Appellant entered her home after she did not answer his phone calls or texts even though PH had never given him a key. One time PH was away with her sister while PH's children, nieces, and nephews remained in her home. Appellant hid in her daughter's bedroom waiting for PH and her sister to return. After several hours, Appellant walked into the living room, terrifying PH's daughter and niece who were unaware Appellant had been in the house. At other times Appellant "would all of a sudden be in [PH's] house" and his truck was nowhere to be seen.

The military judge allowed the Government to introduce PH's testimony under Mil. R. Evid. 404(b). The military judge applied the three *Reynolds* prongs and his analysis cited and generally relied on this court's opinion in *United States v. Jackson*, No. ACM 37417, 2011 CCA LEXIS 303 (A.F. Ct. Crim. App. 15 Aug. 2011) (unpub. op.), *rev. denied*, 71 M.J. 4 (C.A.A.F. 2011) (mem.). In *Jackson*, this court found a military judge did not err in admitting "strikingly similar" uncharged prior acts under Mil. R. Evid. 404(b) that were evidenced by testimony of two women. *Id.* at *17. The acts "involved numerous

instances of what the prosecution characterized as 'the controlling, manipulating, and dominating nature''' of the appellant's relationship with the women, one of whom was the victim of the rape and assault consummated by a battery offenses that were charged in the case. *Id.* at *10. This court found

> [t]he uncharged acts to which they testified amount to more than sporadic instances of jealously or possessiveness; rather, these acts reasonably reflect Appellant's strong desire to dominate and control women, including his desire for sexual control. We find this evidence probative of a motive to batter and rape . . . in that battery and rape may be viewed logically as an ultimate expression of an emotion or desire to dominate and control women, and that numerous acts of such domination and control are also evidence of [a]ppellant's plan, with battery and rape . . . being a logical additional manifestation of that plan.

*Id.* at *17 (citations omitted). Before applying the *Reynolds* test, the military judge made a point to find that "[t]he facts in this case are similar to those detailed in *United States v. Jackson.*" The military judge then proceeded with his analysis of the first *Reynolds* prong, finding PH's testimony was credible despite inconsistencies and her prior felony conviction for possession of cocaine and driving under the influence of alcohol. The military judge found sufficient evidence for the members to find that Appellant committed the prior acts.

Applying the second *Reynolds* prong, the military judge found that the incidents of strangulation during sexual activities made it less probable that the charged assault consummated by a battery of NB was an accident. The military judge found the incidents were in furtherance of a common plan or scheme to perpetuate control through fear against NB by utilizing the same submission and intimidation techniques Appellant used against PH, making it more likely that Appellant's conduct with NB was for the purpose of intentional, physical abuse rather than playful interactions, sexual or otherwise. Regarding incidents in which PH found Appellant in her home without being invited and without her prior knowledge, the military judge found them to be probative of the charged stalking offense. The military judge found the acts were consistent with an intent to control movements and knowledge of a victim's whereabouts, as well as evidence of a common plan or scheme to perpetuate control through fear. The military judge also found Appellant's actions with both women "could be reasonably interpreted as a plan or a scheme with the goal to overcome a feeling of safety by the victim in their residence."

Applying the third *Reynolds* prong, the military judge determined that the probative value of the incidents involving PH was not substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403. The military judge recognized that there was a danger that the evidence that Appellant strangled

PH might mislead the members to find Appellant was a generally violent person and therefore guilty of the assault consummated by a battery offense. Nonetheless, the military judge found the probative value of Appellant's motive, intent, and plan to intimidate or dominate and control his intimate partners was strong. The military judge assessed that the similarity between the strangulation incidents described by PH and NB was strong and tended to negate accident or mistake of fact.[37] Consistent with his Mil. R. Evid. 403 determination, the military judge gave the members an appropriate limiting instruction. The instruction allowed the members to consider evidence that Appellant "may have committed various offenses against [PH][38] . . . . for the limited purpose of its tendency, if any, to show on the part of the accused motive or intent to dominate and/or control his domestic partners, or to show a common plan or absence of mistake" with regard to the charged assault consummated by a battery and stalking offenses.

We find the military judge correctly applied the *Reynolds* test to admit PH's testimony under Mil. R. Evid. 404(b). In *United States v. Moore*, 78 M.J. 868 (A.F. Ct. Crim. App. 2019), *rev. denied*, 79 M.J. 203 (C.A.A.F. 2019), a case this court decided after Appellant's trial, we held that evidence of an appellant's controlling behavior was admissible under Mil. R. Evid. 404(b) to show an appellant's motive, intent, and absence of mistake. *Id.* at 876. In *Moore*, two facts of consequence made more or less probable by admission of Mil. R. Evid. 404(b) evidence were whether the victim consented to sexual acts with the appellant and if not, whether the appellant mistakenly believed that she did. *Id.* at 875. Here, the facts of consequence were whether Appellant engaged in the acts underlying the charged assault consummated by a battery and stalking offenses—elements of the Government's proof that Appellant contested at trial.

In his appeal, Appellant argues that the military judge should not have allowed PH to testify about Appellant choking her, because the evidence showed Appellant did so only as part of sexual activities and because there was no evidence that Appellant's method of choking NB and PH was identical. Appellant also argues there was no evidence Appellant ever entered NB's residence without her permission as PH testified he had done during their relationship. Appellant claims these dissimilarities are enough to render PH's testimony inadmissible under Mil. R. Evid. 404(b). We disagree.

The behavior of the appellant in *Moore* included a range of actions that nonetheless demonstrated a basis for admissibility under Mil. R. Evid. 404(b),

---

[37] The military judge found the time it would take to litigate PH's testimony about the uncharged misconduct was not excessive or a waste of time.

[38] The limiting instruction identified Appellant's uncharged acts with PH as Appellant "strangling her," "stalking her, [and] entering her house . . . ."

because the one thing the appellant's acts had in common was that a factfinder could conclude they were done to exert control over the victim and to repress, instead of respect, the victim's personal autonomy. *Moore*, 78 M.J. at 874–75. Here too, the members could find that Appellant's prior acts involving PH were similarly designed to repress the autonomy of an intimate partner. Moreover, they show Appellant was not deterred in his stalking activities by the presence of his target's family members. The military judge did not err in finding the probative value of Appellant's motive, intent, and plan to intimidate or dominate and control his intimate partners was strong and was not substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403. Even though the circumstances in which Appellant strangled PH were not identical to the charged incident of strangling NB on the couch, they were similar enough to be probative. Notably, the incidents were unexpected and occurred when a factfinder could find that both women showed physical intimacy and affection for Appellant.

We conclude that the military judge properly applied the *Reynolds* test and his ruling was not a clear abuse of discretion. Accordingly, we hold that the military judge did not err in admitting evidence of Appellant's prior acts of strangling PH and entering her residence without her knowledge or permission for a limited purpose to prove the charged assault consummated by a battery and stalking offense.

## E. Admissibility of Expert Testimony

Before resting its case, the Government called Dr. CR to testify in findings as an expert in forensic psychology. After conducting an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session outside the presence of the members, the military judge permitted Dr. CR to testify over the Defense's objection regarding how individuals maintain control in a relationship where there is physical or emotional abuse. Dr. CR also described barriers that keep victims from leaving an abusive relationship. The expert did not give an opinion or testify about the facts of the case. Appellant claims the military judge erred in permitting Dr. CR to testify.

### 1. Additional Background

#### a. Appellant's Defense at Trial

Appellant's defense at trial showed that the misconduct underlying NB's allegations occurred in the midst of her intimate relationship with Appellant. In opening statement, trial defense counsel explained to the members that the evidence would show how that relationship had "gone bad." Counsel also explained they "won't see evidence of [NB] calling the police" to report Appellant's conduct. Rather, he explained "what [the members] will see is that they con-

tinued dating, not only in January, February and March 2015, but they continued dating and being intimate for the next nine months." Trial defense counsel told the members to pay close attention to NB's "ability to remember the negative things that happened between them and her inability to remember . . . the number of times she told [Appellant] how much she loved him, how much she missed him, and how much she wanted to be with him."

Trial defense counsel challenged NB's credibility on cross-examination as he had in opening statement. NB acknowledged she and Appellant frequently engaged in consensual sexual activity after the sexual assault in late December 2014. NB acknowledged she still wanted to be in a long-term, exclusive relationship with Appellant even after the assaults and stalking behaviors occurred. NB disliked that Appellant was seeing another woman and was "very upset" that Appellant would spend time with the other women but he expected her to only be with him. NB acknowledged she and Appellant often argued about how he expected her to be faithful to him when he was not faithful to her, and how Appellant told NB she should end their relationship if NB expected it to be exclusive.

Appellant and NB were mostly in a long-distance relationship between the end of the charged timeframe for the stalking offense in mid-March 2015, and the report of Appellant's conduct to a classmate during a break in NB's in-residence training in December 2015. During the times they were apart, including when Appellant was deployed overseas, NB told Appellant she loved and missed him. Trial defense counsel admitted multiple exhibits in the cross-examination of NB to demonstrate that she sent Appellant cards, letters, and photos, and invited him to her graduation from basic training.

### b. Expert Testimony of Dr. CR

Before resting its case, the Government proffered the expert testimony of Dr. CR. Trial counsel explained that Dr. CR would not testify about the specific facts of the case and would educate the panel on abusive relationships as they "relate[ ] to forensic psychology." In a short Article 39(a), UCMJ, session, held before Dr. CR was called as a witness, trial defense counsel objected to the proffer on grounds that expert testimony would not help the members understand the evidence or determine a fact in issue under Mil. R. Evid. 702(a). Trial defense counsel also objected on grounds that trial counsel was not intending to ask Dr. CR to give an opinion about the specific facts of the case, and as a result the probative value of her testimony under Mil. R. Evid. 403 was therefore diminished and outweighed by the unfair prejudice to Appellant that her

expert testimony would bolster NB's testimony on direct examination.[39] The military judge overruled both objections and recognized Dr. CR as an expert in forensic psychology.

During her testimony, and consistent with the Government's proffer, Dr. CR did not refer to Appellant, NB, or any of the testimony or other evidence in the Government's case. Rather, her testimony that was given without further objection revolved around general characteristics of abusive relationships. She explained there are many ways individuals maintain control in an abusive relationship including "drugs, intimidation, coercion, [and] things of that nature." She described emotional abuse as the "most common" type, which included "threats, the belittling of the partner," "degrading comments, [and] making [the partner] feel at fault." Individuals may use emotional abuse as a way to maintain power and control, and deny what they are doing, to include making the victim think she is "crazy," and abusers "may minimize [the abusing] behavior." She explained "[t]hey may blame the victim themselves," and gave an example in which Dr. CR impersonated an abuser talking to a victim: "If you had never said this, I wouldn't have reacted this way. If you ha[d] behaved in a different way, I wouldn't have gotten so upset."

Dr. CR explained that fear is the number one barrier in the way of someone leaving an abusive relationship or letting others know what is happening to them. Victims are afraid that they will be physically harmed, and they are afraid their family will be harmed if the abuser retaliates. She described how other psychological factors get in the way of a victim leaving an abusive relationship or reporting the abuse: "They often feel ashamed. They feel guilt. Sometimes they blame themselves, often actually they blame themselves for the abuse, for not leaving, [and] for the circumstances of what's happening." Victims may also feel love and attachment to their partner. Dr. CR explained,

> [Q]uite often, despite what we think, they feel attachment, they feel commitment, they feel loved by this person that they've been in a relationship with. And people that feel that way are less likely to let somebody know what's going on, to report things to the police, to do anything to fix that, [and] to leave the relationship.

---

[39] Trial defense counsel did not file a motion to exclude Dr. CR's testimony. The military judge tried to ascertain the exact basis of the objection through a series of questions, leading to trial defense counsel stating that when an expert does not apply the facts of the case to giving an opinion, then the expert testimony is less probative under Mil. R. Evid. 403. Trial defense counsel stated, "I don't object to her being qualified as an expert in forensic psychology. . . . Anything specifically beyond that, I would object to it, but not an expert in forensic psychology."

Finally, Dr. CR described "legal factors" that prevent reporting of abuse. She explained that reporting sometimes "means that your credibility is put on the line. . . . and you may not be believed or that nothing may happen as a result of you asking for help." Sometimes victims of abuse are worried "that if they do report it that this person, that they may be committed to, will get in trouble. They don't want legal consequences for this person that they are married to perhaps or have children with or are in a committed relationship with."

### c. Defense's Findings Argument

In findings argument, the Defense argued that NB's account of Appellant's behavior was not credible because she remained in the relationship. The Defense explained, "It's not reasonable to think that if this [sexual assault] was something that happened that someone would continue on a sexual relationship over the course of a year. It just isn't." When discussing the stalking offense, the Defense questioned, "How is it that someone is in fear of death or bodily harm, while they are dating someone?" The Defense answered his own question, "She's afraid of death or bodily harm, [and] that is why she is staying at his place all the time." As regards the incident of assault consummated by a battery early in the relationship when Appellant choked NB on the couch, the Defense challenged the Government's contention that Appellant "just randomly does it to exercise control." The Defense cast doubt that the strangulation incident happened by asking a rhetorical question as if counsel was speaking directly to NB, "Really, your relationship will continue for nearly a year?"

Near the end of argument, the Defense claimed it was "implausible" that NB would stay in a relationship with Appellant if the incidents she described actually happened. He asked the members to consider the many "valid reasons" someone might stay in an abusive relationship that were not present, including marriage, children, and financial dependence. The Defense made the point that if Appellant's conduct with NB was as she described, then there would have been "powerful motives for leaving" Appellant, and NB would have done so if NB's account of Appellant's conduct were true.

### 2. Law

A military judge's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *Ellis*, 68 M.J. at 344 (citation omitted). Mil. R. Evid. 702 governs the testimony of expert witnesses in a trial by court-martial. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to under-

> stand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The United States Court of Appeals for the Armed Forces (CAAF) has articulated six factors to determine whether a proponent of expert testimony has met the Mil. R. Evid. 702 criteria:

> (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) that the probative value of the expert's testimony outweighs the other considerations outlined in [Mil. R. Evid.] 403.

*United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005) (citing *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993)). Although *Houser* predates the leading Supreme Court decisions in this area, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), *Houser* is consistent with these decisions and continues to guide the admission of expert testimony in courts-martial. *Billings*, 61 M.J. at 166 (citations omitted). "[W]hile satisfying every *Daubert* or *Houser* factor is sufficient, it is not necessary." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007). The military judge's inquiry is "flexible" and "tied to the facts of [the] particular case." *Id.* (internal quotation marks and citations omitted).

### 3. Analysis

We find the military judge did not abuse his discretion in admitting Dr. CR's expert testimony. At trial, Appellant affirmed he had "[n]o objection" to either admitting Dr. CR's curriculum vitae in evidence or recognizing her as an expert in the field of forensic psychology. Appellant's narrow objections at trial were that Dr. CR's testimony would not be helpful to the factfinder under Mil. R. Evid. 702(a), and that it did not satisfy a Mil. R. Evid. 403 balancing test. Appellant did not unmistakably challenge the subject matter, basis, legal relevance, or reliability of Dr. CR's expert testimony. *See Billings*, 61 M.J. at 166.

To preserve a claim of error in a ruling to admit evidence, a party must "state[ ] the specific ground, unless it was apparent from the context." Mil. R. Evid. 103(a)(1)(2). Among Appellant's contentions on appeal is that the military judge failed to "follow the correct legal framework in deciding to admit Dr. CR's testimony" and cites the factors considered by the court in *Billings* and *Houser*. Given that Appellant's broad allegations of error on appeal differ from

the more limited objections lodged by counsel at trial, we must decide if Appellant forfeited his complaint about new grounds for exclusion. "A party is required to provide sufficient argument to make known to the military judge the basis of his objection and, where necessary to support an informed ruling, the theory behind the objection." *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005) (citing *United States v. Banker*, 60 M.J. 216 (C.A.A.F. 2004); *United States v. Brandell*, 35 M.J. 369, 372 (C.M.A. 1992)). "Where an appellant has not preserved an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error." *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007) (citing Mil. R. Evid. 103(d)).

We conclude Appellant's specific objections at trial result in forfeiture, if not waiver, of his more comprehensive challenge on appeal that the military judge failed to follow the *Houser* framework that guides the admission of expert testimony in courts-martial. Appellant did not obviously object on this basis. His objection was that expert testimony was not helpful to the factfinder or admissible under a Mil. R. Evid. 403 balancing test. Testing for plain error and finding none, we decline to grant relief. Dr. CR's testimony couched in general terms about abusive relationships was not obviously irrelevant or unreliable under the *Houser* framework and did not reach any ultimate questions properly left to the members to decide.

Turning to Appellant's specific objections that were preserved for review, Appellant explains on appeal that Dr. CR's testimony was not helpful because the reasons why abuse victims do not leave or report their abusers was common knowledge and only served to improperly bolster NB's credibility. Appellant further explains that Dr. CR's expert testimony about abusers belittling and making degrading comments to their victim-partners amounted to improper propensity evidence that encouraged the members to convict Appellant simply because Appellant said mean things to NB. Appellant contends "[w]ithout Dr. CR linking her opinions to the facts of Appellant's case, her testimony was irrelevant."

In explaining his objection, trial defense counsel referenced the Government's proffer that DR. CR's testimony would not reach the specific facts of the case and remarked that "given this generalized nature" of the proffer, there was no issue of fact that her expert testimony would help the trier of fact to determine. However, in sexual assault cases, expert testimony about what might be considered counterintuitive behavior of a victim has been allowed because it may assist the members in "disabusing themselves of widely held misconceptions." *United States v. Flesher*, 73 M.J. 303, 313 (C.A.A.F. 2014) (quoting *Houser*, 36 M.J. at 398) (internal quotation marks omitted) (citing *United States v. Peel*, 29 M.J. 235, 241 (C.M.A. 1989), *cert. denied*, 493 U.S. 1025 (1990)) (allowing expert to testify that "it was not inconsistent behavior for a

rape victim not to immediate[ly] report the offense" or to "act[ ] as if the rape had never happened"); *United States v. Reynolds*, 29 M.J. 105, 108 (C.M.A. 1989) (allowing clinical psychologist to testify in order to "counter any adverse inferences which might be drawn from the fact that the victim did not immediately report the offense"). Here too, expert testimony could assist the members in understanding NB's actions related to the offenses of stalking and assault consummated by a battery, including why she did not immediately make a report to the police.

The military judge did not abuse his discretion in finding Dr. CR's expert testimony was helpful to the factfinder. We reach this conclusion even though the military judge's ruling is entitled to less deference because he did not articulate balancing the probative value of the testimony against other considerations listed in Mil. R. Evid. 403, particularly whether the relevance of expert testimony was substantially outweighed by any unfair prejudice to Appellant. *See, e.g., United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009).

NB described an abusive relationship from nearly the beginning through the end of her relationship with Appellant. The defense strategy at trial counted on the factfinder believing a premise that was the opposite of Dr. CR's expert opinion: that victims in an abusive relationship are likely to end the relationship and leave. Relying on this premise, Appellant took every opportunity to challenge NB's credibility and the truthfulness of her testimony on grounds that she continued the relationship and stayed. Thus, we reject Appellant's contention on appeal that the reasons why victims do not leave or report their abusers was common knowledge because the strategy of Appellant's defense was to convince the factfinder that the opposite was true.

We similarly reject Appellant's contention that Dr. CR's testimony was irrelevant because she did not link her opinions to the facts of Appellant's case. Appellant finds support for his contention in the language of Mil. R. Evid. 702, which permits an expert to "testify in the form of an opinion or otherwise" on the condition that "the expert has reliably applied the principles and methods to the facts of the case." Mil. R. Evid. 702(d). Rule 702 was modified in 2004 based on an amendment to Federal Rule of Evidence (Fed. R. Evid.) 702, that was effective on 1 December 2000, and is identical to the Federal Rule. *See MCM*, App. 22, at A22-59. The Advisory Committee's note to the 2000 amendment to Fed. R. Evid. 702 allows "an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." Fed. R. Evid. 702 advisory committee's note (2000).[40]

---

[40] The note explains that the amended Rule:

Although Dr. CR did not refer to Appellant, NB, or any of the testimony or other evidence, her testimony touched on two facts of consequence: how individuals maintain control in abusive relationships and the barriers that keep victims from ending those relationships and leaving an abuser. Thus, Dr. CR's testimony was permissible even though she did not testify regarding any specific aspect of Appellant's case.

We find that the probative value of the evidence outweighed the Mil. R. Evid. 403 considerations, and conclude there is no merit to the contention that the military judge abused his discretion in admitting Dr. CR's expert testimony.

### F. Subject-matter Jurisdiction and Notice – Sexual Assault

As discussed in our analysis of the legal and factual sufficiency of Appellant's convictions, Appellant was charged in Specification 1 of Charge I with sexual assault by causing bodily harm, in violation of Article 120(b)(1)(B), UCMJ. As charged, the Government was required to prove that Appellant penetrated her vulva with his penis without consent. *See MCM*, pt. IV, ¶ 45.b.(3)(b). Appellant contends on appeal that the court-martial lacked subject-matter jurisdiction over the sexual assault charge because he was not placed on notice that he could be convicted on a theory other than bodily harm by a nonconsensual sexual act that was charged and referred. Appellant claims the record shows three additional theories that could have been the basis for his conviction.

Branding the charged bodily harm as one "theory," Appellant argues that the Government presented testimony that showed NB may have been either incapable of consenting to the sexual act because she was intoxicated (a second theory) or she was unaware of what was happening (a third theory), and that her testimony interjected these uncharged theories in the Government's findings case. Appellant claims the military judge's instruction to the members that "placing another person in fear does not constitute consent" introduced yet a fourth theory that Appellant was ill-prepared to defend against because

---

> does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Fed. R. Evid. 702 advisory committee's note (2000).

it was neither charged nor referred to trial. Appellant contends the Government simultaneously pursued "mutually exclusive" theories of criminal liability in its findings case.

Appellant relies on the condition that a court-martial only has subject matter jurisdiction over charges that are properly referred to it for his contention that a court-martial lacks jurisdiction over alternate charging theories not included in the referred charge. It follows, Appellant claims, that the court-martial lacked jurisdiction over any theory other than the bodily harm offense that was reviewed at an Article 32, UCMJ, preliminary hearing and referred to trial. Appellant explains there is no subject-matter jurisdiction over an offense that is not referred, citing R.C.M. 201(b)(3) ("Each charge before the court-martial must be referred to it by competent authority."), and argues the record is unclear which of the four theories of criminal liability for sexual assault was used by the factfinder to convict. Relying on this premise, Appellant asserts the Government failed to put him on notice, and he was confused as to which theory of liability he had to defend against, the members also may have been confused, and this court cannot be sure of the basis for Appellant's conviction.

We have reviewed similar contentions in unrelated cases on appeal. In analyzing whether an appellant was convicted on a constructive-force theory rather than bodily harm accomplished by a nonconsensual sexual act, and thus subject-matter jurisdiction was lacking as that appellant claimed, we determined in *United States v. Plourde*, that

> [t]his novel, yet meritless, argument is rooted in a misapprehension of the concept of subject-matter jurisdiction within the military justice system. Such jurisdiction depends "solely on whether the accused 'was a member of the armed services at the time of the offense charged.'" *United States v. Jordan*, 29 M.J. 177, 184–85 (C.M.A. 1989) (quoting *Solorio v. United States*, 483 U.S. 435, 451 (1987)), *vacated on other grounds*, 498 U.S. 1009 (1990). General courts-martial have jurisdiction to try offenses punishable under the UCMJ. Article 18, UCMJ, 10 U.S.C. § 818.

No. ACM 39478, 2019 CCA LEXIS 488, at *13–15 (A.F. Ct. Crim. App. 6 Dec. 2019) (unpub. op.) (rejecting suggestion the Government employed constructive-force theory to convict), *rev. denied*, No. 20-0120, 2020 CAAF LEXIS 106 (C.A.A.F. 27 Feb. 2020); *see also United States v. Jones*, No. ACM 39543, 2020 CCA LEXIS 207, at *14–15 (A.F. Ct. Crim. App. 11 Jun. 2020) (unpub. op.) (rejecting jurisdictional argument by an appellant convicted of sexual assault by bodily harm who claimed members were presented with two theories of sexual assault that were not referred for trial, specifically that he sexually assaulted two victims by placing them in fear, and that he also sexually assaulted one of the victims by penetrating her when she was asleep).

As in *Plourde*, Appellant misconstrues the relevant inquiry with respect to jurisdiction. A general court-martial had jurisdiction to try Appellant for any offense punishable under the UCMJ. Article 18, UCMJ, 10 U.S.C. § 818; *see Ali*, 71 M.J. at 261–62. The specification of sexual assault by bodily harm in violation of Article 120, UCMJ, referred for trial is an offense punishable under the code. Similarly, Appellant was subject to the UCMJ at the time of the offense and at the time of his trial. There is no genuine question that a competent convening authority referred the sexual assault charge, and that the court-martial that tried Appellant had subject-matter jurisdiction over the offense. R.C.M. 201(b)(3).

Further, Appellant was on notice of the charge he had to defend against at trial. The statutory definition of "[t]he term 'bodily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act . . . ." *MCM*, pt. IV, ¶ 45.a.(g)(3). The statutory definition of "consent" includes that it must be "a freely given agreement to the conduct at issue by a competent person." *MCM*, pt. IV, ¶ 45.a.(g)(8)(A). Taken together, the definitions put an accused on notice that when bodily harm is the sexual act charged by the Government, then an alleged victim's competence is at issue. The definitions put Appellant on notice that NB's consumption of alcohol and level of intoxication were among "[a]ll the surrounding circumstances," *MCM*, pt. IV, ¶ 45.a.(g)(8)(C), and were potentially relevant to whether NB consented to the sexual act. The Government has the responsibility to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) (internal quotation marks and citations omitted). The plain language of the elements of the offense and definitions of bodily harm and consent in the statute gives fair notice of the offense and legal basis under which Appellant was charged.

Citing *United States v. Sager*, 76 M.J. 158 (C.A.A.F. 2017), Appellant contends that "the Government was required to charge incapacitation separately," and that the manner in which the Government presented its case amounted to "[t]heory-blending" prohibited by *Sager*. The essence of Appellant's contention is that the Government must singularly focus on a victim's expression of lack of consent through words or conduct when it pursues a bodily harm theory of sexual assault. We disagree and find the comparison to *Sager* inapt. In *Sager*, the appellant was charged with a sexual offense while the victim was "asleep, unconscious, or otherwise unaware." *Id.* at 159. The members found the appellant guilty only under the theory that the sexual act occurred while the victim was "otherwise unaware." *Id.* at 160. The CAAF held that "asleep, unconscious, or otherwise unaware" creates three separate criminal liability theories under Article 120(b)(2), UCMJ, 10 U.S.C. § 920(b)(2), noting the words "are separated by the disjunctive, 'or.'" *Id.* at 161. The CAAF held, "Under the 'ordinary mean-

ing' canon of construction, therefore, 'asleep,' 'unconscious,' or 'otherwise una-ware' as set forth in Article 120(b)(2) reflect separate theories of liability," and to hold differently would render "asleep" and "unconscious" mere surplusage. *Id*. at 162 (citation omitted).

Here, the theory of liability was singular: bodily harm. The explanation of "consent" in the statute reflects not alternative theories of liability separated by the disjunctive "or," as in *Sager*, but a comprehensive definition as it bears upon the Government's proof of a "nonconsensual sexual act" when an accused causes "bodily harm" to another person. We decline to find a requirement for mutually exclusive charging theories in a comprehensive definition or conclude that Congress intended a "bodily harm" theory of sexual assault to only allow the Government to admit evidence that a victim manifests lack of consent through words or conduct. Thus, we reject Appellant's contention that he was charged with one theory of sexual assault and convicted of another.

## G. Findings Instructions

In a related assignment of error, Appellant claims the instructions to the members regarding consent were confusing and misleading because they included the three alternative theories of liability that Appellant contends deprived the court-martial of subject-matter jurisdiction and fair notice. *See* discussion, *supra*. In a separate assignment of error, Appellant also claims that findings instructions were deficient because the military judge failed to instruct on whether Appellant labored under an honest and reasonable belief that NB had the *capacity* to consent to the sexual act charged in Specification 1 of Charge I, in addition to an instruction he did give on mistake of fact as to consent. Although not raised as an issue on appeal, we also consider whether the military judge erred when he failed to instruct the members on the timeframe for the stalking offense when he instructed on the elements of that offense.

### 1. Additional Background

After the close of evidence, the military judge circulated draft findings instructions in an email to counsel for both parties. The next morning, the military judge held an R.C.M. 802 conference to discuss an exchange of emails about the instructions and the findings worksheet. In an Article 39(a), UCMJ, session that followed the conference, the military judge asked the Defense if it had "a final copy of the instructions." The Defense acknowledged it did. The military judge asked the Defense if it had any objections to the instructions or a request for additional instructions. The Defense replied, "No, Your Honor." The military judge then asked if there were any other matters that the parties needed to take up, besides reviewing the findings worksheet. The Defense again answered in the negative. The military judge informed the parties that

he would read the instructions to the members, and after he made any changes, he would mark the instructions as an appellate exhibit.

The military judge instructed the members on the elements of the offenses. However, he did not instruct on a timeframe for the stalking offense.[41] That offense was referred as occurring "between on or about 1 January 2015 and 15 March 2015," and this date range was stated correctly in a copy of the specification that was given to the members after court was assembled.

The military judge also instructed the members on the elements of sexual assault of NB, and then gave the statutory definition of consent including that "[c]onsent means a freely given agreement to the conduct at issue by a competent person" and that "[l]ack of verbal or physical resistance or submission resulting from use of force, threat of force, or placing another person in fear does not constitute consent." *See MCM*, pt. IV, ¶ 45.a.(g)(8)(A). The military judge explained the meaning of a "competent" and "incompetent" person, and the meaning of a "freely given agreement," as the definitions for those terms had been affirmed by our superior court in *United States v. Pease*, 75 MJ 180, 184–86 (C.A.A.F. 2016). The military judge explained that a "competent" person

> possesses the physical and mental ability to consent. And [an] incompetent person is a person who lacks either the mental or physical ability to consent because he or she is one, asleep or unconscious; two, impaired by a drug, intoxicant, or other similar substance; or three suffering from a mental disease or defect or a physical disability. To be able to freely make an agreement, the person must first possess the cognitive ability to appreciate the nature of the conduct in question, and then possess the mental and physical ability to make and to communicate a decision regarding that conduct to the other person. However, if the person has the ability to appreciate the conduct and communicate lack of consent but does not do so out of fear[,] or because of some

---

[41] The military judge instructed on the first element of the offense as follows:

> [I]n the Specification of the Additional Charge, the accused is charged with the offense of stalking, in violation of Article 120a, UCMJ. In order to find the accused guilty of this offense, you must be convinced by legal and competent evidence beyond reasonable doubt: (1) That within the state of Oklahoma, the accused wrongfully engaged in a course of conduct directed at [NB], that is he repeatedly maintained visual and physical proximity to her home and place of work and conveyed threats by words and conduct that would cause a reasonable person to fear bodily harm to herself and members of her immediate family.

other external influence counteracting voluntariness, the sexual conduct is not voluntary.

The military judge concluded his instructions on the definition of consent by explaining that the "[l]ack of consent may be inferred based on circumstances. All of the surrounding circumstances are to be considered in determining whether a person gave consent or whether a person did not resist or cease[d] to resist only because of another person's actions."

Next, the military judge instructed that the evidence raised the issue of mistake of fact as to consent. He explained the Government's burden to prove beyond a reasonable doubt that Appellant was not under a reasonably mistaken belief that NB consented to the alleged sexual conduct. Appellant did not request an instruction that the Government also had the burden to prove beyond a reasonable doubt that Appellant did not labor under a reasonably mistaken belief that NB had the capacity to consent, as Appellant claims for the first time on appeal.

The Defense did not object to the instructions as given or request additional instructions. At the conclusion of instructions and arguments by counsel, the bailiff retrieved the written instructions from the military judge and handed them to the members, and the military judge closed the court for deliberations. In all material respects, the written instructions in the record are the same as the military judge's oral instructions to the members.

### 2. Law

### *a. Duty to Provide Appropriate Legal Guidance to Members*

Whether a military judge appropriately instructed the members is a question of law we review de novo. *United States v. McClour*, 76 M.J. 23, 25 (C.A.A.F. 2017) (quoting *United States v. Medina*, 69 M.J. 462, 465 (C.A.A.F 2011)). "The military judge has an independent duty to determine and deliver appropriate instructions." *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008) (citing *United States v. Westmoreland*, 31 M.J. 160, 163–64 (C.M.A. 1990)). This duty includes giving required instructions that include "[a] description of the elements of each offense charged." R.C.M. 920(e)(1). The military judge is obligated to ensure that an appellant receives a fair trial and this obligation includes the duty to provide appropriate legal guidance. *See United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006) (citation omitted).

We review unchallenged instructions for plain error. *United States v. Blanks*, 77 M.J. 239, 241 (C.A.A.F. 2018) (citation omitted). Under the plain error standard, "Appellant has the burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citing *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)). "[T]he failure to establish any one

of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006).

### b. Waiver

"Whether an appellant has waived an issue is a legal question that this Court reviews de novo." *United States v. Rich*, 79 M.J. 472, 475 (C.A.A.F. 2020) (citing *United States v. Davis*, 79 M.J. 329, 332 (C.A.A.F. 2020)). In *United States v. Gutierrez*, the CAAF rejected plain error review of a required findings instruction under R.C.M. 920(e)(3), observing that its "jurisprudence allows affirmative waiver of affirmative defenses." 64 M.J. 374, 376 n.3 (C.A.A.F. 2007). The trial judge in *Gutierrez* stated "there doesn't appear to be any mistake of fact instruction with regard to battery," and then pointedly asked the Defense, "Are you requesting one?" *Id.* at 376. The court found waiver in defense counsel's equally pointed response, "I simply do not want to request one for the battery." *Id.* The *Gutierrez* court explained, "In making waiver determinations, we look to the record to see if the statements signify that there was a 'purposeful decision' at play." *Id.* at 377 (citing *United States v. Smith*, 50 M.J. 451, 456 (C.A.A.F. 1999)). The court found waiver, reasoning, "[d]efense counsel was presented with the opportunity to request or decline the mistake of fact instruction as to assault consummated by battery. He chose to decline it, and in doing so he affirmatively waived his right to the instruction." *Id.* at 377–78.

In *Davis*, the CAAF again rejected plain error review of a findings instruction. 79 M.J. at 332. The *Davis* court found waiver when an appellant argued for the first time on appeal that the mens rea of "knowingly" applies to the consent element of Article 120c.a(a)(2), UCMJ, 10 U.S.C. § 920c.a(a)(2). *Davis*, 79 M.J. at 331–32. At trial, before instructing the members, the military judge identified the instructions he intended to give including the consent element that the appellant raised as an issue on appeal. *Id.* at 330. After instructing the members, the military judge "asked whether the defense had any objections or requests for additional instructions," and the defense counsel replied, "No changes, sir." *Id.* After marking his written instructions as an appellate exhibit, the military judge again asked if there were any objections, and the defense counsel replied, "No, Your Honor." *Id.* The *Davis* court found, "By expressly and unequivocally acquiescing to the military judge's instructions, Appellant waived all objections to the instructions, including in regards to the elements of the offense." *Id.* at 331 (internal quotation marks and citations omitted).

In *Rich*, the CAAF again found waiver of a mistake of fact defense instruction as the court had found in *Gutierrez*, explaining "when counsel affirmatively decline[s] to object and offer[s] no additional instructions, counsel expressly and unequivocally acquiesce[s] to the military judge's instructions, and

his actions thus constitute waiver." *Rich*, 79 M.J. at 476 (alterations in original) (internal quotation marks omitted) (citing *Davis*, 79 M.J. at 332). In *Davis*, the CAAF observed, "[W]hile we review forfeited issues for plain error, 'we cannot review waived issues at all because a valid waiver leaves no error for us to correct on appeal.'" *Davis*, 79 M.J. at 331 (quoting *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009)). Nonetheless, under Article 66(c), UCMJ, the Courts of Criminal Appeals have the unique statutory responsibility to affirm only so much of the sentence that is correct and "should be approved." Thus, we retain the authority to address errors raised for the first time on appeal despite waiver at trial. *See, e.g.*, *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018); *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citation omitted) (addressing this court's responsibility to "assess the entire record to determine whether to leave an accused's waiver intact, or to correct the error").

### 3. Analysis

We find Appellant affirmatively waived appellate review of the findings instructions even though the Defense remained silent, neither objecting to the instructions as given nor requesting additional instructions, after arguments by counsel. We reach this conclusion from trial defense counsel's earlier discussions with the military judge on the record. The military judge asked the Defense if it had any objections to the final instructions he intended to give or requested additional instructions. The Defense replied, "No, Your Honor." The military judge then asked if there were any other matters that the parties needed to take up before calling the members, and the Defense again answered in the negative.

Trial defense counsel did not just fail to object to the instructions, which would trigger plain error review. *See, e.g., Blanks*, 77 M.J. at 241. Rather, Appellant reviewed the written instructions and conceded to them before they were read to the members and they began their deliberations. *See Davis*, 79 M.J. at 332 (citing *United States v. Wall*, 349 F.3d 18, 24 (1st Cir. 2003) ("[C]ounsel twice confirmed upon inquiry from the judge that he had 'no objection and no additional requests [regarding the instructions].' Having directly bypassed an offered opportunity to challenge and perhaps modify the instructions, appellant waived any right to object to them on appeal." (Alteration in original))). Because trial defense counsel affirmatively declined to object to the final instructions and offered no additional instructions, Appellant expressly and unequivocally acquiesced to the findings instructions, and the actions of his counsel thus constitute waiver. *See Rich*, 79 M.J. at 476 (citations omitted).

We find no reason to pierce Appellant's waiver in this case, *see Hardy*, 77 M.J. at 442–43; *see also Chin*, 75 M.J. at 223.[42] Trial counsel mentioned a "competent person" once in his closing argument when he discussed the military judge's instructions and then gave reasons why NB did not consent to the sexual conduct at issue.[43] Trial counsel also discussed the circumstances surrounding NB's lack of consent: NB was intoxicated, sick, and had difficulty moving and speaking. Notably, trial counsel highlighted the surrounding circumstances that made it unreasonable to believe that Appellant held a reasonable mistake of fact as to consent, especially when Appellant asked NB the morning after the incident in question, "[A]re you okay, because it seems like you didn't want that last night."

We also find no reason to pierce Appellant's waiver of a mistake of fact instruction tailored to address NB's "capacity" to consent to the sexual act charged in Specification 1 of Charge I because a tailored instruction was not necessary. The instruction that was given—that "[m]istake of fact as to consent means the accused held, as a result of ignorance or mistake, an incorrect belief that the other person consented to the sexual conduct as alleged"—was sufficient. It allowed the members to consider whether Appellant was mistaken about any of the surrounding circumstances in determining whether NB gave consent, including any mistake he may have labored under about her level of intoxication.

We also decline to pierce Appellant's waiver of the instruction on the elements of stalking that failed to include the timeframe that was charged in the Specification of the Additional Charge. Further, we would find no material prejudice to Appellant's substantial rights under plain error review if there was error to correct on appeal. *See Knapp*, 73 M.J. at 36. A military judge is required to give the members instructions on findings that include "[a] description of the elements of each offense charged." R.C.M. 920(e)(1). There is no question that by failing to instruct that the Government had the burden to prove beyond a reasonable doubt that the charged conduct occurred "between on or about 1 January 2015 and 15 March 2015," the members were without

---

[42] Even if we were to conclude Appellant had forfeited this issue, rather than waiving it at trial, we would not find plain error with the military judge's instructions defining consent, as the instruction is an accurate statement of the law, *see United States v. Pease*, 75 M.J. 180, 185 (C.A.A.F. 2016), and was neither confusing nor misleading as Appellant contends. We also find no basis in law, and Appellant asserts none, for Appellant's contention that the military judge should have instructed the members that "as a matter of law, NB was determined to be 'competent.'"

[43] Trial counsel argued that "consent is a freely given agreement to the conduct at issue by a competent person. A competent person, and the lack of consent may be inferred based on the circumstances." *See MCM*, pt. IV, ¶ 45.a.(g)(8)(A) and (C).

restriction to convict Appellant of conduct that occurred outside the charged timeframe. In *Hale*, discussed *supra,* a military judge instructed members on the elements of an offense occurring "on or about" a date that was close in time to when the reservist-appellant was not subject to military jurisdiction. 78 M.J. at 272, 274–75. In testing the instruction for plain error, our superior court looked at the evidence and arguments of counsel in reaching the conclusion that the appellant had not shown material prejudice to a substantial right. *Id.* at 274.

We similarly examine the evidence and arguments of counsel in the record before us and find no material prejudice to a substantial right of Appellant. Appellant had been recalled to active duty and was therefore under military jurisdiction from 1 December 2014 through 1 May 2015. His voluntary activation began one month before the first date of the stalking offense, and Appellant remained on active duty for six weeks after the end of the charging window. Most significant, Appellant and NB were predominantly in a long-distance relationship after mid-March 2015 when NB left for basic training. Testimony at trial established that the underlying acts for the stalking offense occurred before the beginning of their long-distance relationship when Appellant was subject to military jurisdiction and "within the state of Oklahoma" as charged. The Defense showed slides to the members in findings argument that properly identified the charged timeframe.[44]

Furthermore, there is no cause for concern that the members would consider evidence of Appellant's conduct after mid-March 2015—during times when they were apart, and later in the year when Appellant visited NB in Georgia—as proof of the stalking offense. This is because the charged conduct was Appellant repeatedly maintaining "visual and physical proximity to [NB's] home and place of work," which coincided with a timeframe early in their relationship when they lived and worked nearby and Appellant was unquestionably subject to military jurisdiction. Thus, as in *Hale*, the prospect of members convicting Appellant of stalking based on acts that occurred when he was not subject to the UCMJ "would be purely speculative," 78 M.J. at 275. We therefore decline to grant Appellant relief for the military judge's error in failing to properly give a required instruction on the elements of the stalking offense not

---

[44] Trial counsel also showed slides to the members in its findings argument. These slides explained the Government's burden to prove that the stalking offense happened within the state of Oklahoma. However, unlike the Defense slides, neither the slides nor oral arguments of the trial counsel identified the dates of the charged timeframe for the stalking offense. As noted previously, these dates were properly identified in a copy of the specification that was given to the members after court was assembled.

only because Appellant waived any objection, but also because we find no prejudice even if there was error to correct on appeal.

## H. Challenges to NB's Victim Impact Statement

### 1. Additional Background

#### a. Notice to Appellant of NB's Unsworn Statement

After the members announced findings, the military judge held an Article 39(a), UCMJ, session to allow both sides to offer their documentary evidence for sentencing outside the presence of the members. After the Government admitted its evidence without objection, trial counsel informed the military judge that NB intended to give an unsworn statement, a copy of which had been given to the Defense after the members announced findings. Before providing a copy to the court, the military judge asked the Defense if it "had an opportunity to review the unsworn statement." Trial defense counsel replied, "Yes, Your Honor, I have had an opportunity to review it." The military judge asked, "[A]re we going to need a discussion on that particular document?" Trial defense counsel replied, "I don't believe so, Your Honor, not given . . . the current state of the law."

Later in the session, trial counsel handed a copy of NB's unsworn statement to the military judge and explained that NB intended to read from it. The military judge asked the Defense, "[S]hould we talk about the statement now, or should we just hold on?" and then asked, "Have you had an opportunity to review [the exhibit]?" Trial defense counsel acknowledged he did. The military judge asked if the Defense had "any specific objections" to which trial defense counsel replied, "No, Your Honor." Before calling the members, the military judge asked if there was anything further that the parties needed to take up. Counsel for both parties answered in the negative.

#### b. Conduct of the Sentencing Hearing

When the court-martial resumed with members, trial counsel published Appellant's personal data and enlisted performance reports and called NB's sister to testify as the Government's only sentencing witness. In three years she saw NB "go through overwhelming amounts of stress, because of her fear of [Appellant] coming after her." Anytime NB would see a black truck or hear the sound of a truck's muffler, NB would be fearful it was Appellant. NB relayed to her sister "countless sleepless nights" and nightmares about Appellant and things he had done to her.

The defense sentencing case consisted of Appellant's oral and written unsworn statements, as well as Appellant's biography, several photographs, two Air Medals, character letters, a Southwest Asia Service Medal, numerous certificates and letters of appreciation, and documentation of other awards and

recognition that Appellant received over 24 years of service. Appellant's written statement was marked as a defense exhibit and was admitted without objection. In his unsworn statements, Appellant asked the members to consider that they were "required to give [Appellant] a dishonorable discharge, which will strip away every single benefit earned over [his] service, to include the retirement [Appellant was] currently entitled to apply for." Appellant related details of growing up in a military family; enlisting in the Air Force; transitioning to the reserve component as an air reserve technician after completing seven years of active duty service; and deploying three times after the attacks on 11 September 2001. Appellant mentioned hardships from constant deployments, the death of his parents, and the loss of his home in Oklahoma due to a tornado.

### c. NB's Unsworn Statement

After the Government and Defense rested, NB read from her written unsworn statement, *see* R.C.M. 1001A.[45] Without objection, NB covered a number of issues and included information about (1) the impact to her of Appellant's uncharged act of strangling her in the shower when Appellant visited her at the school in Georgia, which gave rise to NB reporting Appellant's conduct to law enforcement; (2) the impact to her of the investigation and testifying at trial; (3) her reasons for testifying including her knowledge of past victims, and concern about possible future victims; and (4) the impact to her unit of her absence when she was preoccupied with testifying at Appellant's trial.

### d. Challenges to NB's Unsworn Statement on Appeal

Appellant claims the military judge abused his discretion in allowing the members to consider NB's unsworn victim impact statement under R.C.M. 1001A. In a related issue, Appellant argues his trial defense counsel were ineffective because they failed to object to NB's statement. In response to Appellant's claims of ineffective assistance of counsel, we ordered and received declarations from both trial defense counsel, Maj PF and Captain (Capt) ED. We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes and are convinced such a hearing is unnecessary. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967) (per curiam).

Maj PF declared that in his experience, military judges treated victim impact statements under R.C.M. 1001A in like manner as unsworn statements

---

[45] A victim's right to be reasonably heard, including presentation of an impact statement, is ordinarily exercised between the trial counsel's and Defense's presentation of evidence. R.C.M. 1001(a)(1). Appellant did not object at trial or on appeal to the procedure that was followed at the sentencing hearing.

by an accused, and that military judges liberally construed the "directly relating to or arising from" standard. He did not believe any objection would have been sustained because the contents of NB's statement "generally f[e]ll within the boundaries of R.C.M. 1001A." Maj PF noted several strategic reasons for refraining from objection, and explained that Appellant intended to raise similar issues as matters in mitigation. These matters included the length of time for the investigation, the administrative consequences associated with pending judicial proceedings, and the mental strain of waiting for resolution of the charges at trial.

Capt ED's declaration largely focused on how interrupting NB's delivery of her unsworn statement by objecting in the presence of the members would be viewed "as bullying the victim." In deciding not to object, she also considered NB's "emotional demeanor and testimony in findings, the judge's rulings on [the Defense's] previous objections, [and] the members' response to NB's testimony and demeanor." Ultimately, Capt ED decided that it was strategically unwise to object because the members would use it to Appellant's disadvantage, and it was "very likely" the military judge would have overruled the objection. Rather than objecting, Capt ED focused the members on Appellant's "strong military record, his background, and life consequences of [a] dishonorable discharge and sex offender registration."

### 2. Law

#### a. R.C.M. 1001A

A military judge's interpretation of R.C.M. 1001A is a question of law we review de novo. *United States v. Barker*, 77 M.J. 377, 382 (C.A.A.F. 2018) (citations omitted). Assuming that a military judge has a duty to evaluate an objection to a victim impact statement the same as he would evaluate evidence to determine admissibility, "[a] military judge abuses his discretion when he admits evidence based on an erroneous view of the law." *Id.* at 383 (citations omitted). Thus, a military judge abuses his discretion when his ruling allows a factfinder to consider a victim's unsworn statement based on an erroneous view of law, including an incorrect interpretation of R.C.M. 1001A.

A victim has a right to be reasonably heard in a sentencing hearing. Article 6b(a)(4)(B), UCMJ, 10 U.S.C. § 806b(a)(4)(B). Under R.C.M. 1001A, a victim in a non-capital case may exercise the right to be reasonably heard through a sworn or unsworn statement. R.C.M. 1001A(b)(4)(B). An unsworn statement may be oral, written, or both. R.C.M. 1001A(e). Statements offered under R.C.M. 1001A "may include victim impact or matters in mitigation." R.C.M. 1001A(c). "'[V]ictim impact' includes any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2).

### b. Waiver

 Claims of error with respect to the admission of evidence are preserved if a party both timely objects to the evidence and states the specific ground for the objection. Mil. R. Evid. 103(a)(1). "When an appellant does not raise an objection to the admission of evidence at trial, we first must determine whether the appellant waived or forfeited the objection." *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018) (citation omitted).

 The CAAF describes the difference between waiver and forfeiture as "[a] forfeiture is basically an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in the law."[46] *Campos*, 67 M.J. at 332 (citation omitted). While forfeited issues are reviewed for plain error, "a valid waiver leaves no error . . . to correct on appeal." *Id.* (citations omitted). In determining whether an appellant's failure to protest admission of evidence at trial constitutes waiver, we consider whether there was an intentional relinquishment of a known right. *Id.* (citations omitted).

 In *Campos*, trial counsel moved to admit a stipulation of expected testimony of a witness. 67 M.J. at 331. The military judge explained to the appellant that he had the right not to enter into the stipulation and it would not be admitted without his consent. *Id.* The appellant indicated he understood the military judge's explanations and affirmatively accepted the stipulation as did appellant's trial defense counsel. *Id.* The military judge asked appellant's counsel if he objected to the stipulation, and counsel replied, "No, Your Honor." *Id.* On appeal, the CAAF held the appellant waived his challenge on appeal to admission of the stipulation. *Id.* at 332. The court noted "[w]hile circumstances may arise where a 'no objection' statement by a defense attorney is not enough to demonstrate an intentional relinquishment of a known right," that is not the case where an appellant's counsel "had advance notice" of an exhibit and "considered the impact . . . on his client's case." *Id.* at 332–33.

 In *United States v. Ahern*, our superior court again found waiver and rejected plain error review where evidence was admitted following a "no objection" declaration by a trial defense attorney. 76 M.J. 194, 198 (C.A.A.F. 2017). The *Ahern* appellant argued for the first time on appeal that the military judge erred in admitting a recorded phone conversation between a witness, SS, and the appellant. *Id.* at 195–96. The CAAF found the appellant "was fully aware of the content of the phone calls prior to their admission, and introduced similar evidence in the form of the text message sent by SS." *Id.* at 198. The CAAF

---

[46] Waiver can also occur by operation of law. *See, e.g., United States v. Hardy*, 77 M.J. 438, 441–42 (C.A.A.F. 2018).

also found the appellant "had numerous opportunities to object to the admission of the phone conversations both before and during the trial," but when trial counsel moved to admit the phone calls, the appellant "affirmatively indicated he would not contest that motion." *Id.* Later in the trial, the appellant "replied that he had 'no objection' when the Government actually sought to admit the phone calls and play them for the panel." *Id.*

As discussed previously, Courts of Criminal Appeals have a unique statutory responsibility to affirm only so much of the sentence that is correct and "should be approved." Article 66(c), UCMJ. Thus, we retain the authority to address errors raised for the first time on appeal despite waiver at trial. *See, e.g.*, *Hardy*, 77 M.J. at 442–43; *Chin*, 75 M.J. at 223 (citation omitted).

### c. Effective Assistance of Counsel

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)).

Allegations of ineffective assistance of counsel are reviewed de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza,* 67 M.J. 470, 474 (C.A.A.F. 2009)). "To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of defense counsel was deficient" and that this deficiency resulted in prejudice. *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citing *Strickland*, 466 U.S. at 698). Accordingly, we consider "(1) whether counsel's performance fell below an objective standard of reasonableness, and (2) if so, whether, but for the deficiency, the result would have been different." *United States v. Gutierrez*, 66 M.J. 329, 331 (C.A.A.F. 2008) (citations omitted).

When evaluating the performance of counsel, we employ a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Since counsel are presumed competent, an appellant must rebut this presumption by showing specific errors that were unreasonable under prevailing professional norms. *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987) (citation omitted). In effect, this requires a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *United States v. Dewrell*, 55 M.J. 131, 133 (C.A.A.F. 2001) (citations omitted). Failure to pursue a particular legal claim, however, is not necessarily deficient conduct by counsel. "If that claim is not shown to have a reasonable

probability of being found meritorious as a matter of law and fact, the failure to pursue it is not error and certainly not ineffective assistance of counsel." *United States v. Terlep*, 57 M.J. 344, 349 (C.A.A.F. 2002).

### 3. Analysis

Appellant was sentenced on 5 January 2018, just over two weeks after this court issued its decision in *United States v. Hamilton*, 77 M.J. 579 (A.F. Ct. Crim. App. 2017) (en banc), *aff'd on other grounds*, 78 M.J. 335 (C.A.A.F. 2019).[47] In *Hamilton*, the appellant's trial defense counsel objected to the admission of victim impact statements on the bases that they failed to comply with R.C.M. 1001A. *Id.* at 583–84. This court held that victim impact statements offered under R.C.M. 1001A are not "evidence," and thus "the balancing test in Mil. R. Evid. 403 is inapplicable to assessing the reasonable constraints that may be placed upon such statements." *Id.* at 586. We explained,

> Mil. R. Evid. 403 addresses "legal relevance" and provides that "evidence" may be excluded notwithstanding its logical relevance. In the decision to allow a victim to exercise their right to be heard on sentencing, a military judge is neither making a relevance determination nor ruling on the admissibility of otherwise relevant evidence. Instead, the military judge assesses the content of a victim's unsworn statement not for relevance, but for scope as defined by R.C.M. 1001A.

*Id.* In *Hamilton*, we acknowledged the military judge has an "obligation to ensure the content of a victim's unsworn statement comports with the defined parameters of victim impact or mitigation as defined by the statute and R.C.M. 1001A."[48] *Id.* at 585–86 (citing R.C.M. 1001A, Discussion ("A victim's unsworn statement should not exceed what is permitted under R.C.M. 1001A(c) . . . . Upon objection or *sua sponte*, a military judge may stop or interrupt a victim's unsworn statement that includes matters outside the scope of R.C.M. 1001A.")).

---

[47] This court issued its en banc decision in *Hamilton* on 20 December 2017. *See Hamilton*, 77 M.J. at 586.

[48] Our holding was limited to the determination that victim impact statements, like an accused's unsworn statement, are not evidence: "Reading the plain language of the rules, we hold that unsworn victim impact statements offered pursuant to R.C.M. 1001A are not evidence." *Hamilton*, 77 M.J. at 583 (citing *United States v. Provost*, 32 M.J. 98, 99 (C.M.A. 1991) (if an accused elects to make an unsworn statement, he is not offering evidence)).

The CAAF affirmed this court's decision in *Hamilton* on grounds that the appellant suffered no prejudice by "[t]he victim impact statements . . . [that] d[id] not comply with the requirements of R.C.M. 1001A (2016), and, thus, were improperly admitted." *United States v. Hamilton*, 78 M.J. 335, 342, 343 (C.A.A.F. 2019). Consequently, the CAAF did not reach the question whether R.C.M. 1001A statements are subject to the Military Rules of Evidence. *Id.* at 342. The CAAF observed, "in those cases where a military judge complies with the detailed parameters set forth in R.C.M. 1001A (2016) and exercises sound discretion in determining whether the 'right to be reasonably heard' is exceeded, resolution of [the issue whether R.C.M. 1001A statements are subject to the Military Rules of Evidence] is unlikely to be dispositive."[49] *Id.* Although the military judge remains a gatekeeper for victim impact statements, an appellant nonetheless has a duty to state the specific grounds for objection in order to preserve a claim of error. *See generally*, *id.* at 340 n.5 (noting the appellant's challenge to the victim impact statement on appeal was "far clearer than the basis for his objections at trial," but nonetheless would fail under the more stringent plain error test because there was no prejudice).

Because the pertinent law at the time of Appellant's sentencing hearing has not changed between Appellant's sentencing and his appeal, we evaluate Appellant's claims for waiver and not plain error. *See Davis*, 79 M.J. at 331 (review for plain error is appropriate "when a new rule of law exists, as an appellant gets the benefit of changes to the law between the time of trial and the time of his appeal" (alteration, internal quotation marks, and citations omitted)). After the members announced findings, the military judge twice asked the Defense if it had an opportunity to review NB's unsworn statement, and each time the Defense acknowledged it did. After the first inquiry by the military judge, the Defense informed the court it did not believe any discussion about the statement was needed given the "current state of the law." After the military judge was given a copy of the statement, he pointedly asked the Defense if it had "any specific objections." Trial defense counsel replied, "No, Your Honor." Before calling the members, the military judge asked if there was anything further that the parties needed to take up, and the Defense answered in the negative.

On these facts we find trial defense counsel's actions at the sentencing hearing amounted to waiver of the issue whether matters NB presented to the members was within the scope of a victim's unsworn statement under R.C.M.

---

[49] "Of course, to the extent that provisions of the Military Rules of Evidence contradict the crime victim's right to be 'reasonably heard' under R.C.M. 1001A (2016), see, e.g., M[il]. R. E[vid]. 603, the clear intent of Congress and the President dictate that the latter controls." *Hamilton*, 78 M.J. at 335, 342 n.9 (citing Article 6b, UCMJ, 10 U.S.C. § 806b).

1001A. Appellant's trial defense counsel manifested awareness of the "current state of the law," which allowed a victim to inform the members of any social or psychological impact that was directly relating to or arising from the offenses of which Appellant was found guilty. R.C.M. 1001A(b)(2); *see Hamilton*, 77 M.J. at 586. In his colloquy with the Defense, the military judge presented defense counsel with four opportunities to make an objection, even asking if there were any "any specific objections" and counsel responded that he had none. As we noted earlier in our discussion of waiver, we recognize that this court is permitted, under Article 66(c), UCMJ, to review issues affirmatively waived by an appellant at trial. *Chin*, 75 M.J. at 223. Accordingly, after having reviewed the entire record, and considering Appellant's claims of ineffective assistance of counsel, which we discuss next, we decline to pierce Appellant's waiver.

We turn then to Appellant's claims that his counsel were ineffective by failing to object to the contents of NB's unsworn statement that referenced impact due to uncharged misconduct, trial participation, past and future victims, and impact on others. We consider each contention in turn.

### a. Uncharged Misconduct

In her unsworn victim impact statement, NB told the members that the "events of this relationship had significant impact on both [her] personal and professional life," and "negatively impacted [her] ability to work." She explained how Appellant's uncharged act of choking her in the shower when Appellant visited her at the school in Georgia was "nearly devastating for [her] professional career." She almost failed defensive tactics training required for law enforcement duties "because of the fear [Appellant] instilled in [her] by his actions." She described how she crawled into a fetal position against a wall and was paralyzed with fear when she was tasked to demonstrate how to defend herself against someone who role-played a male aggressor. She explained that her instructors were aware of Appellant's conduct in her dorm room, and they gave her one last chance to demonstrate a proper response to an assailant. She knew that failure would mean losing her new civilian job. She told the members she nonetheless graduated with a leadership award, a high grade point average, and achieved qualification as an expert in marksmanship.

Appellant contends in this appeal that NB's unsworn statement should have been limited to the offenses of which Appellant was found guilty; instead, NB referred to "the relationship" itself as having injurious impact to her. He claims his counsel were ineffective by failing to object to NB's presentation of uncharged misconduct, noting that Appellant was not tried for strangling NB in the shower in December 2015.

We determine that even if trial defense counsel were deficient, Appellant has not met his burden to show a reasonable probability that the objectionable portions of NB's unsworn statement would have changed the outcome or undermined confidence in the sentence. *See Strickland*, 466 U.S. at 694–96; *see id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). Consideration of prejudice includes an examination of the sentencing hearing to determine if NB's objectionable statements would "have altered the sentencing profile presented to the sentencing judge," or in this case, the members. *Id.* at 700.

To begin with, NB's victim impact statement elaborated on evidence about the relationship that the members heard in findings. The underlying facts of the shower incident were already before the members having been properly admitted under Mil. R. Evid 404(b) to show Appellant's motive or intent to dominate and control NB with regard to the charged strangulation offense. NB testified that the shower incident made her more fearful than other incidents because it revealed to her that she had a limited "ability to overcome [Appellant]" and "to get away from him." She explained in her testimony that the incident caused her to realize the "possibility [she] could have died" and it "really sunk in that [she had] to do something" because "if [Appellant] does it again [she] might not make it." She testified, "He's already followed me. He's already watched me;" and, referring to both strangulation incidents, she testified "[h]e's already done that to me twice." The testimony of a classmate substantiated NB's explanation that her reporting of the shower incident set in motion an investigation of the offenses for which Appellant was convicted.

NB's sister similarly testified about the continuing impact of Appellant's offenses, explaining how in three years she observed NB "go through overwhelming amounts of stress, because of her fear of [Appellant] coming after her." NB's sister illustrated NB's fear by describing the "countless sleepless nights that [NB] told [her] about, where [NB] wakes up having nightmares about [Appellant] and things that he's done to [NB]." Thus, NB's unsworn statement about the relationship, and the shower incident specifically, was not new information that the members heard for the first time at the sentencing hearing. Rather, they were related to the facts and circumstances of the case.

On no fewer than four occasions, the military judge instructed the members that Appellant was to be sentenced for the offenses of which he was found

guilty.[50] We presume the members followed this instruction in the absence of evidence of the contrary. *See Washington*, 57 M.J. at 403 (citation omitted).

Accordingly, we find trial defense counsel were not constitutionally ineffective under the Sixth Amendment by failing to object to NB's comments regarding the shower incident and the relationship.

### b. Investigation and Trial Participation

After NB's classmate reported Appellant's conduct to an instructor, NB became preoccupied with the investigation. She explained that the investigation and trial "has been a 3-year experience and process for [her]. It has been a cycle that has continuously played on [a] loop, but now the cycle is broken." NB described in general terms how participating in the investigation and trial was personally and professionally difficult, and she now knew "how difficult it is" and "why people don't come forward." She told the members about stress from "listening to people manipulate, twist things, [and] take things out of context just to fit their agenda." She now knew "the torture and living nightmare this process is" and "what it feels like to have people think that [she is] a liar" with "ulterior motives for coming forward." She again spoke in general terms about reliving and feeling "things that [she] never wanted to feel again," and her regret in not reporting Appellant's sexual assault immediately after it happened. NB also gave the members a specific example of the stress she felt at the prospect of testifying, describing three panic attacks she experienced the morning she was called as a witness in findings. NB also gave specific examples of the impact of the case on her civilian career and on her duties in the Army Reserve as her unit prepared to deploy to the Middle East. In her own words,

> I wanted to focus on my career, but with the distraction of this case it kept me preoccupied with things as I was trying to move forward. Again, had I not gratefully had the support from a friend, I could have potentially lost my job in the beginning of my career.

---

[50] The military judge explained, "It is the duty of each member to vote for a proper sentence for the offenses of which the accused has been found guilty[,] . . . [a] single sentence shall be adjudged for all offenses of which the accused has been found guilty." The military judge then reiterated, "Your deliberations should focus on an appropriate sentence for the accused for the offenses of which the accused stands convicted." Later in the context of sex offender registration, the military judge instructed, "Your duty is to adjudge an appropriate sentence for this accused based upon the offenses for which he has been found guilty . . . ."

Appellant contends that NB's unsworn statement was an improper comment on Appellant's right to plead not guilty and to require the Government to prove its case, and thus constitutional error. We disagree.

In *United States v. Stephens*, this court observed it would be unreasonable for someone who commits a sexual assault offense "to argue it is unforeseeable that the victim of a sexual assault would be called [to] testify at a trial." 66 M.J. 520, 528 (A.F. Ct. Crim. App. 2008) (holding that evidence regarding the impact on a thirteen-year-old sexual assault victim of having to testify on multiple occasions was proper evidence in aggravation), *aff'd* 67 M.J. 233 (C.A.A.F. 2009). Just as this court concluded in *Stephens* that "[h]aving to testify at trial . . . is directly related to, and results from, the commission of the offense" under R.C.M. 1001(b)(4), we find the "directly relating to or arising from" language of R.C.M. 1001A would likewise encompass a victim's unsworn statement about the impact of participating in an investigation and being called to testify at trial.[51] *Id.*

The CAAF affirmed this court's decision in *Stephens*, observing that "[t]estimony as to the effect of the process, including the trial, on the victim, as was admitted here, certainly comes within the rather broad ambit" of R.C.M. 1001(b)(4). *United States v. Stephens*, 67 M.J. 233, 235 (C.A.A.F. 2009). However, "a rule or other provision of the *Manual for Courts-Martial* cannot sanction a violation of Appellant's constitutional rights." *Id.* (citing *United States v. Lopez*, 35 M.J. 35, 39 (C.M.A. 1992) (noting that the military justice system has hierarchical sources of rights beginning with the Constitution and that "[n]ormal rules of statutory construction provide that the highest source authority will be paramount, unless a lower source creates rules that are constitutional and provide greater rights for the individual")). Second, "sentencing evidence is subject to the requirements of Military Rule of Evidence (M.R.E.) 403." *Id.* (citations omitted).

In Appellant's sentencing hearing, as in *Stephens*, "there was no explicit comment" by the victim "concerning Appellant's invocation of his rights but rather, a brief reference to the effect of the entire proceeding (including, but not limited to, the trial) on Appellant's victim." *Id.* at 236. Without specific attribution to Appellant or his trial defense counsel, NB told the members about stress from not being believed and from people believing she had ulterior

---

[51] There may be a difference between "arising from" and "resulting from" but it is unnecessary to our analysis. *Compare* R.C.M. 1001A(b)(2) *with* R.C.M. 1001(b)(4). However, plain and unambiguous language in a Rule for Courts-Martial should be applied, not interpreted. *United States v. Leonard*, 21 M.J. 67, 69 (C.M.A. 1985) (citations omitted). It is also unnecessary to consider in this case if a crime victim's "right to be reasonably heard" under Article 6b(4)(B), UCMJ, is subsumed by the rule.

motives. She did not explicitly comment on Appellant exercising his right to plead not guilty and to a trial of the facts. Accordingly, we find no constitutional violation for the reasons articulated by our superior court. Unlike *Stephens*, however, this ends the inquiry. Evidence offered in aggravation under R.C.M. 1001(b)(4) is subject to Mil. R. Evid. 403 balancing to determine if its probative value is substantially outweighed by the danger of unfair prejudice. In contrast, and as discussed previously, an unsworn victim impact statement presented under R.C.M. 1001A is not "evidence," and thus "the balancing test in Mil. R. Evid. 403 is inapplicable to assessing the reasonable constraints that may be placed upon such statements." *Hamilton*, 77 M.J. at 586.

Notwithstanding our conclusion, we caution military judges, as the CAAF cautioned trial counsel in *Stephens*, to use care in allowing members to consider victim impact statements, which, like evidence in aggravation, "may cross the line into impermissible comment on an accused's invocation of his constitutional rights. While [the CAAF found] no abuse of discretion [in *Stephens*], it is not difficult, particularly in cases involving sexual abuse, to envision such a case." *Id.*

Accordingly, we find trial defense counsel were not constitutionally ineffective under the Sixth Amendment by failing to object to NB's comments regarding the investigation and trial process.

### c. Past and Future Victims

NB told the members that she "didn't think [she] was going to testify, [or] be able to testify." And, the reason she was in court "is because other people previously did not speak their truth and tell their story." She explained, "If and when these things happened to the next target, [she] wouldn't have been able to live with [her]self knowing that [she] could have prevented it." She believed if she had not cooperated in the investigation, Appellant "would have found another weak and vulnerable girl to fall into his cycle of chaos." NB "knew [she] wasn't the first one, and it's likely that [she] wouldn't be the last" if she had not told her story. "Going through this process has been one of the hardest things [she has] done."

Appellant contends his counsel were ineffective by failing to object to NB's statements that were outside the scope of R.C.M. 1001A because Appellant was not convicted of an offense against anyone other than NB. To the extent that NB's statement related to a previous victim, evidence at trial indicated that NB was aware Appellant had engaged in acts of misconduct with a previous intimate partner, PH. The members also received evidence in findings of Appellant's sexual misconduct with PH that was admitted under Mil. R. Evid. 413. As to the possibility of future victims, we find it was not unreasonable for a victim of the offenses for which Appellant was found guilty to be concerned

about the possibility of Appellant doing to others what he had been found guilty of doing to her. Importantly, trial defense counsel could reasonably conclude that NB's concern for past and future victims was one and the same as her own fear, and thus was a matter "directly relating to or arising from" the offenses. R.C.M. 1001A. Had trial defense counsel objected to NB's assertions on grounds that it was beyond the scope of R.C.M. 1001A, Appellant has not shown it was likely the objection would have been sustained.

We find Appellant's trial defense counsel did not "ma[k]e errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Dewrell*, 55 M.J. at 133 (internal quotation marks omitted). Thus, we are not persuaded that Appellant has demonstrated a reasonable probability that a challenge to NB's statements about past and future victims would have been found meritorious as a matter of law, and that the failure to object at the sentencing hearing amounted to ineffective assistance of counsel. *See Terlep*, 57 M.J. at 349.

### d. Impact on Others

As part of her victim impact statement, NB related that Appellant's actions affected "multiple people in personal and professional ways," and "utilize[d] government workers' time and attention across multiple states." In spite of these generalized statements, NB did not identify who was impacted or how. In contrast, NB provided details of how her participation as a witness at Appellant's trial affected her reserve unit that was preparing to deploy, although her statement was largely couched in terms of its impact to herself:

> Lastly, this has had a lasting impact on my military career. I'm within 20 days of a 400-day mobilization to Iraq and Syria. Even as an E4 I'm in a leadership role. I have soldiers I'm accountable for and accountable to. I have been mentally absent due to focusing and preoccupation with this case and the stress of testifying. We are in the final stages of preparation, which are stressful[,] busy[,] and intense. I cannot be there to do my final qualification for being my team's gunner, and I was removed from being the gunner on my team.

NB gave further details of the impact of her absence, including an incident involving one of her soldiers that happened on a Thursday evening when she was on standby after testifying a day earlier at Appellant's trial:

> Not only my team had to be rearranged to re-create a team in my absence, but because of this[,] other teams had to be rearranged, and it posed a risk of making our company non-deployable due to not having enough fully qualified teams to create a deployable roster. This weighed on me heavily, because of the

bond my gunner team had, and also because I felt I was letting them down and not being able to focus and support them. We have overcome and succeeded, not to my credit but to the credit of the soldiers I serve with. Thankfully, I have a good team and remain close to them, even like family, in my absence.

Additionally, just Thursday night one of my soldiers ended up in a hospital due to stroke. I was not able to be there for him. Thankfully, another soldier stepped up to be by his side. However, again due to this I was not there for my soldier. I was not able to be with him, and I left him behind because I had no choice, as I am here. In this critical time for our team, bonding and building our strength, I'm absent. Still, I am grateful for the team I have because they have become my family.

Appellant contends that NB's statement was outside the scope of R.C.M. 1001A. To the extent NB told the members about consequences to others as a result of testifying at Appellant's trial, we agree and find it remarkable that the Defense did not raise any objection.[52] The scope of R.C.M. 1001A includes impact directly relating to or arising from an offense of which an appellant is found guilty. The rule does not countenance impact to anyone other than a "crime victim," which, in the record before us, does not include "multiple people," "government workers," or "Soldiers." And furthermore, it is nexus to crime that is the relevant inquiry under the rule, and not consequences of being away from one's unit owing to the burden of testifying at trial.

However, we can again resolve Appellant's ineffectiveness claim on the prejudice prong, without determining whether counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 697. Upon review of the record, Appellant has not met his burden of establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. We again examine if NB's objectionable statements would "have altered the sentencing profile" presented to the members. *Strickland*, 466 U.S. at 700.

Significantly, NB did not request, and trial counsel did not argue for, a heightened sentence due to the portion of NB's statement that is in question.

---

[52] Capt ED's concern that objecting in the presence of the members might be viewed as "bullying" the victim is inapt, because the military judge gave the Defense an opportunity to challenge NB's prepared statement in an Article 39(a), UCMJ, session held outside the presence of the members.

Rather, trial counsel used NB's concern for her hospitalized Soldier and "whether her troops are going to be ready to deploy" to illustrate how Appellant's offenses damaged "[a] strong woman who cares for other people," and then reminded the members about NB's findings testimony where she stated she had difficulty "admitting" that she "can't even protect [her]self" from Appellant even while she is "supposed to hold [her]self to a certain level and protect others."[53]

We also evaluate this portion of NB's victim impact statement in the context of each party's sentencing evidence. The Government's sentencing case was convincing even though it was succinct. NB's sister testified as the Government's only witness, but her relationship and communication with NB substantiated NB's extensive testimony in findings about the stress and fear NB experienced from Appellant's conduct. Other findings witnesses corroborated this impact, but NB's sister's testimony at the sentencing hearing was most compelling. Anytime NB would see a black truck or hear the sound of a truck's muffler, NB would be fearful it was Appellant. As discussed previously, NB relayed to her sister about nightmares and lost sleep she experienced thinking about Appellant's conduct. Although not part of the Government's case, evidence in the record of NB's demeanor as she delivered her unsworn statement lends credence to her findings testimony that Appellant's conduct affected her three years later in the manner that her sister described.

Appellant's sentencing case was comparatively weak and consisted almost entirely of documentation of Appellant's superior duty performance over the span of 24 years, first on active duty and then as a reservist. The focus of the Defense was Appellant's career, the loss of retirement benefits, collateral consequences of sex offender registration, and personal hardships including the amount of time he was under investigation and waiting to be tried. Appellant apologized to NB but offered little insight about himself or explanation of his conduct on which a factfinder might rely to lessen an otherwise appropriate sentence.[54]

We again determine that Appellant has not met his burden to show a reasonable probability that the objectionable portions of NB's unsworn statement

---

[53] Trial counsel summarized NB's trial testimony in sentencing argument, explaining that NB's "career is built on her need to defend others, [and] her belief that she can defend others. You saw her testifying that she does not have that ability any more. How can she defend others when she cannot even defend herself?"

[54] At the outset of the sentencing hearing, the military judge informed Appellant that he "will have the opportunity to present evidence in extenuation and mitigation of the offenses of which [he] ha[d] been found guilty. That is matters about the offenses or [him]self, which [he] want[s] the court to consider in deciding [his] sentence."

would have changed the outcome or undermined confidence in the sentence. *See Strickland*, 466 U.S. at 694–96.

## I. Effective Assistance of Counsel—Value of Retirement Benefits

Appellant claims trial defense counsel were ineffective by failing to offer evidence of the value of military retired pay Appellant would have been eligible to receive if he had not received a mandatory dishonorable discharge. We are not persuaded that Appellant's counsel provided ineffective assistance in this aspect of the representation.

### 1. Additional Background

In response to Appellant's claims, we ordered and received declarations from Maj PF and Capt ED. We again considered whether a post-trial evidentiary hearing is required to resolve any factual disputes and are convinced such a hearing is unnecessary. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967) (per curiam).

Maj PF declared that Appellant "specifically mentioned the loss of his potential retirement in his verbal and written unsworn statements." He noted that the panel contained two senior Air Force officers, Col P and Lt Col G. The Defense believed the inclusion of a retirement pay chart not only would have been superfluous, but it would have been patronizing to the members.

Capt ED's declaration states the Defense's sentencing case focused on Appellant's lengthy military service. The Defense highlighted his extensive training, "stunning" performance reports, deployments, and awards and decorations. The Defense also submitted several character letters addressing Appellant's outstanding military career. The Defense emphasized the life consequences of the mandatory dishonorable discharge including Appellant's loss of retirement pay in Appellant's unsworn statement and again in sentencing argument. Capt ED explained that evidence of Appellant's salary was listed in the Appellant's Personal Data Sheet that the Government admitted into evidence. Capt ED did not think that evidence of Appellant's projected loss of retirement pay was necessary. She explained,

> There are multiple ways to argue loss of retirement, and I chose an approach that was best fitting our sentencing strategy. I chose to focus not how much money the Appellant lost, but that he lost his retirement and over twenty years of his military career. I also relied on the members' military experience and intelligence to estimate the amount of money the Appellant was losing in his retirement pay. At the end, in addition to highlighting the Appellant's loss of retirement, I also believed that stressing the lifelong consequences of being convicted of a felony-level of-

fense and [that Appellant was] required to register as a sex offender was an effective strategy to minimize his confinement risk.

### 2. Analysis

The declarations of Appellant's trial defense counsel explain the reasons why the Defense chose to argue the significance of a dishonorable discharge without evidence of the value of the retirement benefits Appellant may have been eligible to receive. Their explanation of the defense sentencing strategy included reasonable considerations that we will not second-guess. *Mazza*, 67 M.J. at 475. While Appellant's appellate counsel may have chosen a different sentencing strategy, it does not mean that the strategy used at trial was objectively unreasonable. We evaluate trial defense counsel's performance not by the success of their strategy, but whether the counsel made reasonable choices from the alternatives available at trial. *Dewrell*, 55 M.J. at 136 (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998)). We find that they did, and therefore conclude that Appellant was not denied effective representation in sentencing under the Sixth Amendment in this respect.

## J. Sentencing Instructions

Appellant claims the military judge erred by failing to *sua sponte* provide the members with an instruction clarifying that NB was giving a victim impact statement that was not under oath as he did for Appellant's unsworn statement. Appellant also claims error in that the military judge failed to instruct on the impact of a punitive discharge on retirement benefits Appellant claims he would have been eligible to receive.

### 1. Additional Background

After the close of evidence and before NB read her unsworn victim impact statement, the military judge held an Article 39(a), UCMJ, session with counsel for both parties to discuss sentencing instructions. The military judge and counsel discussed tailoring the instruction regarding Appellant's unsworn statement; however, there was no discussion about instructing on the unsworn statement NB intended to read to the members.

After court was called to order with the members present, the military judge asked, "Does the victim—the main victim in the case wish to make an unsworn statement?" Trial counsel answered in the affirmative and the military judge directed trial counsel to "mark that written unsworn statement as a court exhibit." After trial counsel complied, the military judge asked, "Does she wish to make an oral statement as well?" Trial counsel answered in the affirmative, and NB then stood at the podium and read her written statement to the members. NB then returned to her seat in the gallery and trial counsel published her written statement to the members. NB's written statement

bears no indicia that it was sworn as would an affidavit or declaration made under penalty of perjury.

Before arguments by counsel for both parties, the military judge gave the members substantive instructions to guide them in reaching a sentence. The instructions he provided on their use of an unsworn statement did not specifically mention NB's unsworn victim impact statement; the first half of his instruction was tailored to Appellant's unsworn statement. The members were instructed that,

> The court will not draw any adverse inference from the fact that the accused has elected to make a statement which is not under oath. An unsworn statement is an authorized means for an accused to bring information to the attention of the court and must be given appropriate consideration. The accused cannot be cross-examined by the prosecution or interrogated by court members or myself upon an unsworn statement. But the prosecution may offer evidence to rebut statements of fact contained in it.

Immediately following this portion of the instruction, the military judge provided general guidance on the members' consideration of an unsworn statement that did not specifically mention Appellant other than a factual statement that Appellant had referenced sex offender registration in his unsworn statement:

> The weight and significance to be attached to an unsworn statement rests within the sound discretion of each court member. You may consider that the statement is not under oath, it's [sic] inherent probability or improbability, whether it is supported or contradicted by other evidence in the case, as well as any other matter that may have a bearing upon its credibility.

> In weighing an unsworn statement, you are expected to use your common sense and your knowledge of human nature and the ways of the world. The accused's unsworn statement included the accused's personal feelings about sex offender registration. An unsworn statement is a proper means to bring information to your attention, and you must give it appropriate consideration.

The military judge also provided instructions on the effect of a dishonorable discharge, which were silent about its impact on retirement benefits. After reminding the members that the law imposes a mandatory minimum sentence of a dishonorable discharge for the offense of sexual assault, the military judge explained,

The stigma of a punitive discharge is commonly recognized by our society. A punitive discharge will place limitations on employment opportunities and will deny the accused other advantages which are enjoyed by one whose discharge characterization indicates that he has served honorably. A punitive discharge will affect an accused's future with regard to his legal rights, economic opportunities, and social acceptability. Such a discharge deprives one substantially of all benefits administered by the Department of Veteran Affairs and the Air Force establishment. A dishonorable discharge is reserved for those who are separated under conditions of dishonor after conviction of serious offenses of a civil or military nature warranting such severe punishment.

After the arguments of counsel for both parties, the Defense neither objected to the omission of an instruction tailored to NB's unsworn statement, nor did the Defense request such an instruction. Likewise, the Defense neither objected to the instruction that was given on the impact of a punitive discharge, nor requested an instruction specifically tailored to provide the members with information about the impact of a dishonorable discharge on Appellant's eligibility for retirement benefits.

At the conclusion of reading the instructions to the members, the military judge asked, "[D]oes either side object to or request any additional instructions? The Defense answered, "No, Your Honor."

### 2. Analysis

We find by "expressly and unequivocally acquiescing to the military judge's instructions," Appellant waived appellate review of his challenges to the sentencing instructions that were given to the members by the military judge. *See Davis*, 79 M.J. at 331 (citing *United States v. Smith*, 9 C.M.R. 70, 72 (C.M.A. 1953)). We find no reason to pierce Appellant's waiver in this case, *see Hardy*, 77 M.J. at 442–43; *see also Chin*, 75 M.J. at 223, because the military judge committed no error. An instruction on a victim's unsworn statement is not one of the mandatory sentencing instructions under R.C.M. 1005(e). *See also United States v. Miller*, 58 M.J. 266, 268 (C.A.A.F. 2003). And, the members were not given inaccurate or misleading instructions as to its use. Consequently, the omission of a tailored instruction on NB's unsworn victim impact statement was not legal error. In the context in which NB presented her statement, we have no reason to believe that the members were incapable of applying the military judge's instruction on consideration of "an unsworn statement" to NB's unsworn statement as well as Appellant's. Thus, the military judge did not err by failing to give a tailored instruction on NB's unsworn statement.

"The test for when a military judge must instruct on the impact of a punitive discharge on retirement benefits is simple: There must be (1) an evidentiary predicate and (2) a request for the instruction." *United States v. Easterly*, 79 M.J. 325, 326 (C.A.A.F. 2020) (citing *United States v. Boyd*, 55 M.J. 217, 221 (C.A.A.F. 2001)). Here, we need not decide whether Appellant's time and status as a member in the Air Force Reserve established the necessary evidentiary predicate because "no request was made, and the military judge thus had no duty to give the instruction." *Id*. Thus, the military judge did not err by failing to instruct on the impact of a punitive discharge on retirement benefits.

**K. Sentence Severity**

Appellant claims his sentence that included confinement for four years and a dishonorable discharge was inappropriately severe, and that the most severe sentence that should be approved is six months of confinement. For support, Appellant highlights that "[h]e served more than 24 years in the military," deployed several times, and had a flawless service record until the incidents for which he was convicted.[55]

At the same time Appellant argues his sentence is inappropriately severe, Appellant renews his argument that there were multiple errors that affected Appellant's sentence, and asks this court to either reassess and impose a sentence that would have been adjudged but for the errors, or remand for a rehearing. *See United States v. Boone*, 49 M.J. 187, 197 (C.A.A.F. 1998). Appellant draws our attention to NB's unsworn statement and the military judge's failure to instruct the members on the use of that statement, his counsel's failure to introduce evidence of the retired pay Appellant could have received if a punitive discharge had not been adjudged, statements made by trial counsel in sentencing argument, and that NB's sister was not a victim because Appellant "was not convicted of any offense related to her."[56]

---

[55] Appellant adds that "[h]e was honorably discharged from active duty after his court-martial." As noted previously, Appellant's service on active duty was characterized as honorable, but there is no evidence he was discharged from either the Air Force or the Air Force Reserve after the court-martial.

[56] Appellant's unqualified contention that NB's sister was not a victim and that Appellant was not convicted of any offense related to her is incorrect as a matter of fact and law. As proof of the stalking conviction, the evidence showed NB's sister grabbed a knife and was placed in fear of her life and for the lives of her children when she witnessed Appellant's attempt to force entry into NB's home. Evidence in aggravation includes impact "to any person or entity who was a victim of an offense committed by the accused" as well as "circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." R.C.M. 1001(b)(4).

We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we] find correct in law and fact and determine[ ], on the basis of the entire record, should be approved." Article 66(c), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omitted). Our review extends to mandatory minimum sentences established in Article 56, UCMJ, 10 U.S.C. § 856. *United States v. Kelly*, 77 M.J. 404, 406 (C.A.A.F. 2018). While we have great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

We have given individualized consideration to Appellant, the nature and seriousness of his offenses, his record of service, and all other matters contained in the record of trial. In addition, we have considered Appellant's claimed errors, including waived issues raised for the first time on appeal. Understanding we have a statutory responsibility to affirm only so much of the sentence that is correct and should be approved, Article 66(c), UCMJ, we determine the sentence, including the mandatory dishonorable discharge which we have the authority to disapprove, is not inappropriately severe. Appellant was adjudged a fraction of the maximum term of confinement of 33 and a half years. Appellant's sexual assault of NB, the violence he demonstrated by strangling NB as she relaxed with him on her couch, and the fear he brought about in NB and NB's sister through the incidents underlying the stalking offense, amply supports confinement for a term of four years and a dishonorable discharge. We find the approved sentence is not inappropriately severe as a matter of law.

**L. Timeliness of Post-Trial Processing and Appellate Review**

Appellant claims he is entitled to relief for excessive post-trial delay where the convening authority did not take action until 268 days after Appellant's court-martial adjourned. We examine the circumstances of the delay and Appellant's assertion of his right to timely post-trial processing and claim of prejudice in our analysis. In addition, although not raised by Appellant, we consider the issue of timely appellate review.

**1. Law**

Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

When the convening authority does not take action within 120 days of the completion of trial, the delay is presumptively unreasonable. *Moreno*, 63 M.J. at 142. A presumption of unreasonable delay also arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Id.* If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially unreasonable delay, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or [Appellant]." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(c), UCMJ, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 221, 225 (C.A.A.F. 2002).

### 2. Timeliness of Post-Trial Processing

We determine there was no violation of Appellant's right to due process and a speedy post-trial review. Applying the first two *Barker* factors, we find the length of the delay and the assertion of the right to timely post-trial processing both count in Appellant's favor. In *United States v. Arriaga*, the CAAF found a 243 day delay was "not de minimis," even if not as egregious as other cases. 70 M.J. 51, 56 (C.A.A.F. 2011). And, Appellant twice asserted his right to speedy post-trial processing, first on 16 May 2018, and again on 3 June 2018. The Government concedes these *Barker* factors weigh in Appellant's favor, and we agree.

The reasons for the delay count in Appellant's favor. Between adjournment on 5 January 2018, and action on 30 September 2018, the Government compiled a lengthy, eight-volume record of trial that included a 756-page transcript. There were several issues with degradation of audio that delayed transcription. The legal office reached out to the trial judiciary on several occasions between 30 January 2018 and 20 April 2018 to attempt to expedite transcription. On 11 July 2018, the legal office received the authenticated transcript. Post-trial processing was slowed somewhat by a 30-day delay as the legal office tried to obtain input from NB on clemency, and a ten-day extension Appellant was given to submit his clemency matters. However, the bulk of the delay—202 days—came from transcribing and assembling the record of trial.

As to the fourth and final *Barker* factor, considerations of prejudice count against Appellant. Appellant claims prejudice from the oppressive incarceration and anxiety that followed the Government's decision to curtail his active duty status and not place him on orders for the duration of his post-trial confinement. This action terminated Appellant's pay and allowances and TRI-CARE medical benefits for himself and his dependent daughter.[57] Appellant claims particularized anxiety and concern for his daughter was due to his inability to provide financial support and medical benefits. Appellant also claims he lost his civilian job because he was placed in an AWOL status instead of leave-without-pay. However, none of these consequences would have been less likely to have occurred if the convening authority took action within 120 days of the completion of trial. We find Appellant's claims are without merit because Appellant has not shown prejudice that can be attributed to the Government's delay in the post-trial processing of his case.

The CAAF has held that "where there is no finding of *Barker* prejudice, we will find a due process violation only when, in balancing the other three factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. In this case, the prejudice analysis is determinative. Because Appellant fails to demonstrate prejudice, and we find the remaining factors are not so egregious—despite the 268 days between the announcement of sentence and initial action of the convening authority—as to impugn the fairness and integrity of the military justice system, we find no violation of Appellant's rights under *Moreno*. Recognizing our authority under Article 66(c), UCMJ, we have also considered if relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736,

---

[57] Appellant also claims the conditions of his incarceration were oppressive as outlined in his submission pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude that such an exercise of our authority is not appropriate in this case.

### 3. Timeliness of Appellate Review

Appellant's case was originally docketed with the court on 15 October 2018. The overall delay in failing to render this decision by 15 April 2020 is facially unreasonable. *See Moreno*, 63 M.J. at 142. However, we determine no violation of Appellant's right to due process and a speedy appellate review. Analyzing the *Barker* factors, we find the delay is not excessively long. The reasons for the delay include the time required for Appellant to file his brief on 10 September 2019, and the Government to file its answer on 6 December 2019. Appellant filed a reply on 13 January 2020. We granted ten enlargements of time—nine for Appellant and one for the Government—for appellate counsel to prepare their brief in support of the assignments of error, the answer, and the reply. In addition, Appellant raises an unusually large number of issues to which we applied our careful attention, resulting in an unusually long opinion explaining the court's decision.

The court affirms the findings and sentence in this case after examining numerous assignments of error that Appellant claims occurred at trial, the sentencing hearing, and during post-trial processing. However, Appellant has not asserted his right to speedy appellate review or pointed to any particular prejudice resulting from the presumptively unreasonable delay, and we find none. Finding no *Barker* prejudice, we also find the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. *See Toohey*, 63 at 362. As a result, there is no due process violation. *See id.* In addition, we determine that Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief for Appellant unwarranted.

## III. Conclusion

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and the sentence are **AFFIRMED.**

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court